# EXHIBIT 6

# PROSPECTUS



## UNIVERSAL MARITIME INC.

(Corporation organized under the laws of the Republic of the Marshall Islands)

**NOK 1,020 million to NOK 1,200 million ($~170 million to $~200 million) initial public offering**

**Indicative Price Range of NOK 45 to NOK 60 ($~7.5 to $~10) per Offer Share**

**Listing of the Company's shares on the Oslo Stock Exchange (alternatively Oslo Axess)**

---

The information contained in this prospectus (the **"Prospectus"**) relates to the initial public offering and listing of the common shares, each with a par value of $0.01 (the **"Shares"**), of Universal Maritime Inc. (the **"Company"**), a corporation organized under the laws of the Republic of Marshall Islands (taken together with its consolidated subsidiaries, **"Universal"**) on Oslo Børs (the **"Oslo Stock Exchange"**) or, in the event that the Company does not qualify for listing on the Oslo Stock Exchange, on Oslo Axess, (the **"Listing"**).

The global offering (the **"Offering"**) in an amount of minimum NOK 1,020 million and maximum NOK 1,200 (equivalent to million minimum $170 million and maximum $200 million using exchange rate of 6.0 Norwegian kroner to U.S. Dollars) comprises of (i) an institutional offering which comprises an offer to (a) institutional and professional investors in the European Economic Area (the **"EEA"**) pursuant to the provisions of Article 3(2) of the EU Prospectus Directive 2003/71/EC, (b) in the United States of America (the **"U.S."** or the **"United States"**), to "qualified institutional buyers" (**"QIBs"**) as defined in, and in reliance on, Rule 144A (**"Rule 144A"**) under the United States Securities Act of 1933, as amended (the **"U.S. Securities Act"**), and (c) to institutional investors outside the EEA and the United States pursuant to applicable exceptions from local requirements; subject to a lower limit per application of an amount of NOK 1,000,000 (the **"Institutional Offering"**); and (ii) an offering to the public in Norway subject to a lower limit per application of an amount of NOK 10,500 and an upper limit per application of an amount of NOK 999,999 for each investor (the **"Retail Offering"**). All offers and sales outside the United States will be made in reliance on Regulation S under the U.S. Securities Act. Except where the context requires otherwise, references in this Prospectus to **"Shares"** will be deemed to include the **"Offer Shares"**, in addition to all other common shares of the Company.

The Company will issue minimum 19,428,571 and maximum 22,857,143 new Shares (the **"Offer Shares"**) provided that the final offer price for each Offer Share is set at the mid-point of the indicative price range set out above (the **"Indicative Price Range"**). The final number of Offer Shares to be issued will depend on the final amount of the Offering and the final offer price of each Offer Share (the **"Offer Price"**).

In addition, the Company will grant DNB Markets (the **"Stabilization Manager"**) an option to, with the consent of the board of directors of the Company (the **"Board"**), over-allot a number of Shares up to 10% of the number of Offer Shares allocated in the Offering (the **"Additional Shares"**), on the terms and subject to the conditions described in this Prospectus (the **"Over-Allotment Option"**).

The offer period for the Institutional Offering (the **"Bookbuilding Period"**) is expected to run from 09:00 hours (Central European Time, **"CET"**) on June 20, 2012 to 17:30 hours (CET) on July 3, 2012. The application period for the Retail Offering (the **"Application Period"**) is expected to run from 09:00 hours (CET) on June 20, 2012 to 12:00 hours (CET) on July 3, 2012. The Bookbuilding Period and the Application Period may at the Company's own discretion, and for any reason, be closed prior to or extended beyond the set times, however, will close no earlier than 12:00 hours (CET) on June 26, 2012 and no later than 17:30 hours (CET) on July 20, 2012.

All Shares will be registered in the Norwegian Central Securities Depository (the **"VPS"**). All Shares will rank pari passu with one another and each carry one vote per Share on a poll.

Prior to the Offering, the Shares have not been publicly traded. The Company has applied for admission to trading of the Shares on the Oslo Stock Exchange. The Listing on the Oslo Stock Exchange (or, in the event that the Company does not qualify for listing on the Oslo Stock Exchange, on Oslo Axess) has been approved by the board of directors of the Oslo Stock Exchange on June 13, 2012, subject to certain conditions. Completion of the Offering is conditional upon, inter alia, the fulfilment of the conditions for Listing and completion of certain transactions as set out herein.

The due date for the payment of the Offer Shares is expected to be on or about July 9, 2012 for the Retail Offering and July 10, 2012 for the Institutional Offering. Delivery of the Offer Shares is expected to take place on or about July 10, 2012. The Offer Shares will be delivered through the VPS. Trading in the Shares on the Oslo Stock Exchange (alternatively Oslo Axess) is expected to commence on or about July 12, 2012, under the ticker code "UMAR".

**Investing in the Shares involves a high degree of risk. See Section 2 "Risk Factors" beginning on page 17.**

## Joint Lead Managers and Joint Bookrunners

DNB Markets                    Fearnley Fonds ASA                    RS Platou Markets AS

## Financial advisor to the Company

DVB Capital Markets

**The date of this Prospectus is June 19, 2012**

# IMPORTANT INFORMATION

This Prospectus has been prepared in connection with the Offering and the Listing of the Shares on the Oslo Stock Exchange (alternatively Oslo Axess).

For the definition of certain technical terms and other terms used throughout this Prospectus, see Section 21 "Definitions and glossary".

This Prospectus has been prepared to comply with the Norwegian Securities Trading Act of June 29, 2007 no. 75 (the **"Norwegian Securities Trading Act"**) and related secondary legislation, including the Commission Regulation (EC) no. 809/2004 implementing Directive 2003/71/EC of the European Parliament and of the Council of November 4, 2003 regarding information contained in prospectuses (the **"Prospectus Directive"**) as well as the format, incorporation by reference and publication of such prospectuses and dissemination of advertisements. This Prospectus has been prepared solely in the English language. The Financial Supervisory Authority of Norway (Nw.: Finanstilsynet) (the **"Norwegian FSA"**) has reviewed and approved this Prospectus in accordance with Sections 7-7 and 7-8 of the Norwegian Securities Trading Act.

The information contained herein is current as of the date hereof and subject to change, completion and amendment without notice. In accordance with Section 7-15 of the Norwegian Securities Trading Act, significant new factors, material mistakes or inaccuracies relating to the information included in this Prospectus, which are capable of affecting the assessment of the Shares between the time when this Prospectus is approved and the date of listing of the Shares on the Oslo Stock Exchange (alternatively Oslo Axess), will be included in a supplement to this Prospectus. Neither the publication nor distribution of this Prospectus, nor any sale of the Offer Shares made hereunder, shall under any circumstances create any implication that there has been no change in Universal's affairs or that the information herein is correct as of any date subsequent to the date of this Prospectus.

The Company has engaged DNB Markets, a part of DNB Bank ASA (**"DNB Markets"**), Fearnley Fonds ASA (**"Fearnley Fonds"**), and RS Platou Markets AS (**"RS Platou Markets"**) as Joint Lead Managers and Joint Bookrunners (the **"Joint Lead Managers"** or the **"Managers"**) for the Offering.

In making an investment decision, each investor must rely on its own examination, and analysis of, and enquiry into the Company and the terms of the Offering, including the merits and risks involved. None of the Company or the Managers, or any of their respective representatives or advisers, is making any representation to any offeree or purchaser of the Offer Shares regarding the legality of an investment in the Offer Shares by such offeree or purchaser under the laws applicable to such offeree or purchaser. Each investor should consult with his or her own advisors as to the legal, tax, business, financial and related aspects of a purchase of the Shares.

All inquiries relating to this Prospectus or the matters addressed herein should be directed to the Company or the Managers. No person is authorized to give information or to make any representation in connection with the Offering or sale of the Offer Shares other than as contained in this Prospectus. If any such information is given or made, it must not be relied upon as having been authorized by the Company or the Managers or by any of the affiliates, advisors or selling agents of any of the foregoing.

The distribution of this Prospectus and the Offering and sale of the Offer Shares in certain jurisdictions may be restricted by law. This Prospectus does not constitute an offer of, or an invitation to purchase, any of the Offer Shares in any jurisdiction in which such offer or sale would be unlawful. Neither this Prospectus nor any advertisement or any other offering material may be distributed or published in any jurisdiction except under circumstances that will result in compliance with any applicable laws and regulations. The Company and the Managers require persons in possession of this Prospectus to inform themselves about and to observe any such restrictions.

**THE OFFER SHARES HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT AND MAY NOT BE OFFERED OR SOLD IN THE UNITED STATES ABSENT REGISTRATION OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE U.S. SECURITIES ACT. THE OFFER SHARES ARE BEING OFFERED AND SOLD ONLY (1) IN THE UNITED STATES IN RELIANCE ON RULE 144A ONLY TO QIBS (AS THAT TERM IS DEFINED IN RULE 144A) AND (2) OUTSIDE THE UNITED STATES TO PERSONS OTHER THAN "U.S. PERSONS" (AS THAT TERM IS DEFINED IN REGULATION S UNDER THE U.S. SECURITIES ACT ("REGULATION S")) IN OFFSHORE TRANSACTIONS IN RELIANCE UPON REGULATION S. PROSPECTIVE PURCHASERS OF THE OFFER SHARES ARE HEREBY NOTIFIED THAT SALE OF THE OFFER SHARES IN THE UNITED STATES OR TO U.S. PERSONS IS SUBJECT TO CERTAIN TRANSFER RESTRICTIONS, DESCRIBED IN SECTION 7 "SELLING AND TRANSFER RESTRICTIONS". EACH PURCHASER OF THE OFFER SHARES IN THE UNITED STATES WILL BE DEEMED TO HAVE MADE CERTAIN REPRESENTATIONS AND ACKNOWLEDGMENTS, INCLUDING, BUT NOT LIMITED TO, THAT THE PURCHASER IS A QIB.**

The Offer Shares are subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under applicable securities laws and regulations. Investors should be aware that they may be required to bear the financial risks of this investment for an indefinite period of time. Any failure to comply with these restrictions may constitute a violation of the securities laws of any such jurisdiction. For further information on the manner of distribution of the Offer Shares and the transfer restrictions to which they are subject, see Section 7 "Selling and transfer restrictions".

Any reproduction or distribution of this Prospectus, in whole or in part, and any disclosure of its contents is prohibited.

This Prospectus and the terms and conditions of the Offering as set out herein shall be governed by and construed in accordance with Norwegian law. The courts of Norway, with Oslo as legal venue, shall have exclusive jurisdiction to settle any dispute which may arise out of or in connection with the Offering or this Prospectus.

The Offer Shares have not been approved or disapproved by the United States Securities and Exchange Commission ("SEC"), any State securities commission in the United States or any other U.S. regulatory authority, nor have any of the foregoing authorities passed upon or endorsed the merits of the Offering or the accuracy or adequacy of this Prospectus. Any representation to the contrary is a criminal offence in the United States.

# TABLE OF CONTENTS

**Section**                                                                                                      **Page**

1    SUMMARY ...................................................................................................................... 4

2    RISK FACTORS ............................................................................................................. 18

3    RESPONSIBILITY STATEMENT ................................................................................... 34

4    GENERAL INFORMATION ............................................................................................ 35

5    THE ACQUISITION OF THE INITIAL FLEET ............................................................... 40

6    THE OFFERING ............................................................................................................. 42

7    SELLING AND TRANSFER RESTRICTIONS ............................................................... 53

8    MARKET OVERVIEW ................................................................................................... 57

9    GROUP DESCRIPTION ................................................................................................. 76

10   BUSINESS OVERVIEW ................................................................................................ 79

11   BOARD, MANAGEMENT AND EMPLOYEES .............................................................. 97

12   SELECTED FINANCIAL INFORMATION ..................................................................... 106

13   OPERATIONAL AND FINANCIAL REVIEW ................................................................ 114

14   UNAUDITED PRO FORMA FINANCIAL INFORMATION ............................................ 136

15   RELATED PARTY TRANSACTIONS ........................................................................... 148

16   DIVIDENDS AND DIVIDEND POLICY ......................................................................... 150

17   DESCRIPTION OF THE SHARES AND SHARE CAPITAL......................................... 151

18   SECURITIES TRADING IN NORWAY ......................................................................... 156

19   TAXATION .................................................................................................................... 159

20   DOCUMENTS ON DISPLAY ....................................................................................... 168

21   DEFINITIONS AND GLOSSARY ................................................................................. 169


APPENDIX A:    AMENDED AND RESTATED ARTICLES OF INCORPORATION AND AMENDED AND RESTATED BYLAWS ...... A-1

APPENDIX B:    PREDECESSOR COMPANIES COMBINED FINANCIAL STATEMENTS FOR THE YEARS ENDED
               DECEMBER 31, 2011, 2010 AND 2009 ................................................................................ B-8

APPENDIX C:    PREDECESSOR COMPANIES INTERIM COMBINED FINANCIAL INFORMATION FOR THE THREE
               MONTH PERIODS ENDED MARCH 31, 2012 AND 2011 ................................................................ C-25

APPENDIX D:    UNIVERSAL MARITIME INC, CONSOLIDATED FINANCIAL STATEMENTS FOR THE PERIOD FROM
               MARCH 3, 2011 (DATE OF INCEPTION) THROUGH DECEMBER 31, 2011 ......................................... D-41

APPENDIX E:    UNIVERSAL MARITIME INC., CONSOLIDATED INTERIM FINANCIAL STATEMENTS FOR THE THREE
               MONTH PERIOD ENDED MARCH 31, 2012.............................................................................. E-46

APPENDIX F:    CHARTER FREE SHIPBROKER VALUES FROM CLARKSON PLC ................................................... F-52

APPENDIX G:    APPLICATION FORM FOR THE RETAIL OFFERING ................................................................ G-55

# 1 SUMMARY

*The following summary must be read as an introduction to the full text of this Prospectus and highlights, and is qualified in its entirety by information presented in greater detail elsewhere in this Prospectus and the appendices hereto. This summary is not exhaustive and does not contain all the information that should be considered before investing in the Shares. Any investment decision relating to the Offering and an investment in the Shares should be based on the consideration of this Prospectus as a whole, including Section 2 "Risk factors" and the financial information included in Appendix B, Appendix C, Appendix D and Appendix E. Where a claim relating to the information contained in this Prospectus is brought before a court, a plaintiff investor might, under the national legislation of a member state of the EEA, have to bear the costs of translating this Prospectus before legal proceedings are initiated. No civil liability attaches to those persons who have prepared this summary, including any translations thereof, unless it is misleading, inaccurate or inconsistent when read together with other Sections of this Prospectus.*

## 1.1 Introduction to Universal

Universal is a shipping company planning to assemble and operate a fleet of modern crude tankers. Its Initial Fleet will consist of modern Aframax and Suezmax tankers which will be employed in a manner that Management believes provide downside protection while preserving upside potential.

Eight of Universal's vessels are on time charters to Shell. Shell, together with its affiliates, is a major international charterer with a strong reputation as a creditworthy counterparty. Universal plans to expand its relationship with Shell and pursue growth through adding additional vessels to its existing fleet.

To facilitate Universal's growth strategy in the short term, Geden has agreed to grant the Company a fixed rate purchase option on two Suezmax vessels. Universal will also seek to expand its fleet through acquisitions of secondhand tonnage, if and when this is determined appropriate. Universal may elect to place additional vessels on time charters, in the spot market or on fixed-rate time charters, depending on what is considered most profitable given the markets at that time.

## 1.2 Information about the Company

Universal Maritime Inc. was incorporated under the laws of the Republic of Marshall Islands on March 3, 2011 with principal executive offices located at c/o UM (USA) LLC, 545 Madison Avenue, 9th floor, New York, NY 10022 U.S. and telephone number +1 (646) 833-0302. The Company's business registration number is 46163. The Company's website is www.universalmaritimeinc.com.

The Company's registered office is at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands MH96960. The name of the Company's registered agent at such address is The Trust Company of the Marshall Islands, Inc.

## 1.3 History

The Company has limited operating history, having been formed as a shell company by Geden on March 3, 2011 for the purposes of raising equity from outside investors to be used for the purchase of crude oil tanker vessels and eventually owning and operating such vessels. At the date of this Prospectus, all issued and outstanding capital stock of the Company is owned by Geden.

## 1.4 Board of directors, Management and employees

As of the date of this Prospectus the Board is composed of three members, M. Bülent Ergin, A. Tuğrul Tokgöz and Mehmet Mat. From the first day of listing, three new and independent board members, Jens Ismar, James Drakos and Claus Plougmand, will join the Board in addition to the existing Board Members.

The names and positions of the Board Members as of listing are set out in the table below:

| Name | Position | Served since | Term expires |
|---|---|---|---|
| M. Bülent Ergin | Chairman | March 2011 | 2015 |
| A. Tuğrul Tokgöz | Vice Chairman | March 2011 | 2014 |
| Mehmet Mat | Director | March 2011 | 2013 |
| Jens Ismar | Director | First day of listing | 2013 |
| James A. Drakos | Director | First day of listing | 2014 |
| Claus Plougmand | Director | First day of listing | 2015 |

Universal has three employees as of the date of this Prospectus. These are the members of the Management, which consists of:

| Name | Employed with Universal since | Current position within Universal |
|---|---|---|
| Ronald A. Dal Bello | April 2011 | Chief Executive Officer |
| Richard M. Lemanski | April 2011 | Chief Financial Officer, Treasurer and Secretary |
| Christos G. Papanicolaou | April 2011 | Senior Vice President |

### 1.5    Shares and share capital

The Company's authorized capital stock as of the date of this Prospectus consists of 100,000,000 Shares with a par value $0.01 per Share, of which 500 are currently issued and outstanding. All the issued Shares in the Company are currently owned by Geden which in turn is 100% indirectly owned by the Karamehmet family in Turkey.

As further described in Section 5.2 "The acquisition of the Initial Fleet—The Acquisition Agreement", Geden will receive 10,610,647 Shares in the Company as compensation for the sale of Initial Fleet. Furthermore, Geden will subscribe for up to 2 million Offer Shares in the Offering. Assuming that Geden is allocated 2 million Offer Shares in the Offering, Geden will have an ownership interest in the Company following completion of the Offering of at least 37.68% if the Company raises $200 million in the Offering and 41.98% if the Company raises $170 million in the Offering assuming final Offer Price is set in the mid-point of the Indicative Price Range set out on the front page of the Prospectus. Geden's ownership interest will be reduced to 35.27% and 39.43% respectively if the Over-Allotment Option is exercised in full.

Upon the closing of the Offering, the Company will reserve an amount equal to 7% of the Shares sold in the Offering for issuance under the terms of the warrants granted to Shell pursuant to the Master Umbrella Agreement.

### 1.6    Acquisition of the Initial Fleet

The Company and Geden are parties to the Acquisition Agreement dated May 28, 2012, providing for the transfer of 5 modern suezmax tankers and 5 modern aframax tankers from Geden to the Company. Closing of the Acquisition Agreement is a condition of the completion of the Offering as further described below, and it is expected the Acquisition Agreement will be closed one Business Day prior to the settlement date in the Institutional Offering.

The Company will acquire the ten vessels, through the acquisition of all of the shares in the ten Predecessor Companies owning the ten vessels constituting the Initial Fleet. The Initial Fleet is further described in Section 10.3 "Business overview—Fleet overview".

### 1.7    Related party transactions

The Company as well as the Predecessor Companies have entered into several agreements with related parties in addition to the Acquisition Agreement. These are:

The Option Agreement – The Company and Geden have entered into an option agreement, pursuant to which the Company has an option to purchase up to two additional crude oil tankers from Geden.

Agreement on Right of First Refusal – The Company and Geden have entered into an agreement which grants the Company rights of first refusal to any and all long term business opportunities developed by Geden in the crude oil, blue water, transportation segment for as long as Geden remains a major shareholder of the Company.

Technical management agreements – The Predecessor Companies have entered into technical management agreements with GDAS, an affiliate of the Çukurova Group, a large Turkish business conglomerate that is affiliated with Geden, for their vessels.

Service Agreement – The Company has entered into a service agreement with GDAS on behalf of each of the Predecessor Companies.

Promissory note – On June 17, 2011 the Company issued a promissory note to Geden for the repayment of pre-offering expenses advanced to the Company from time to time.

Reimbursement Agreement – Under this agreement Geden undertook to reimburse to Groton Pacific Carriers Inc, GPC Maritime Corp, Universal Maritime (USA) LLC, James Drakos, Christos G Papanicolaou and Richard Lemanski the expenses incurred by such parties in the amount of $1,300,000 in connection with an attempted but failed initial public offering related to a company called Universal Maritime Corp. (later renamed GPC Maritime Corp.) in 2010.

Sponsor Agreement – The Company and Geden have entered into a Sponsor Loan and Guarantee Agreement pursuant to which Geden has provided to the Company a financial facility in the amount of $5.0 million in connection with the establishment of Universal and the Offering.

### 1.8     Bylaws

The Company's bylaws as of the date of this Prospectus are attached to this Prospectus as Appendix A and are further described in Section 17.7 "Description of the Shares and share capital—The Articles of Incorporation, the Bylaws and Marshall Island law".

### 1.9     The Offering

The Offering is being pursued as part of the Company's strategy to establish Universal as an international shipping company through the acquisition and operation of modern Aframax and Suezmax tankers. The net proceeds of the Offering will partially be used, together with the New Debt Facility to repay the Existing Debt in total approximately $395.8 million and for general working capital purposes.

| | |
|---|---|
| The Offering | The Offering comprises: |
| | •    The Institutional Offering, in which Offer Shares are being offered to (i) institutional and professional investors in the EEA pursuant to the provisions of Article 3(2) of the EU Prospectus Directive 2003/71/EC, (ii) in the United States, to QIBs as defined in, and in reliance on, Rule 144A under the U.S. Securities Act and (iii) to institutional investors outside the EEA and the United States pursuant to applicable exceptions from local prospectus requirements; subject to a lower limit per application of an amount of NOK 1,000,000 for each investor. |
| | •    The Retail Offering, in which Offer Shares are being offered to the general public in Norway subject to a lower limit per application of an amount of NOK 10,500 and an upper limit per application of an amount of NOK 999,999 for each investor. |
| | For further details see Section 6 "The Offering". |
| The Offer Shares | Minimum of 19,428,571 and maximum of 22,857,143 Shares, each with a par value of $0.01 assuming that the Offer Price is set at the mid-point of |

Universal Maritime Inc. – Prospectus

|                                              | the Indicative Price Range. |
|----------------------------------------------|------------------------------|
| The Additional Shares | Pursuant to the Over-Allotment Option, the Managers will be granted an option to, with the consent of the Board, over-allot a number of Shares of up to 10% of the number of Offer Shares offered in the Offering. |
| Bookbuilding Period | The Bookbuilding Period for the Institutional Offering is expected to take place from June 20, 2012 at 09:00 hours (CET) to July 3, 2012 at 17:30 hours (CET). |
| Application Period | The Application Period for the Retail Offering is expected to take place from June 20, 2012 at 09:00 hours (CET) to July 3, 2012 at 12:00 hours (CET). |
| Indicative price range | NOK 45 to NOK 60 ($~7.5 to $~10) per Offer Share |
| Offer Price | The final price per Share in the Offering which will be set based on the orders placed in the Institutional Offering. |
| Mechanism of allocation | The anticipated allocation of Offer Shares between the Institutional Offering and the Retail Offering is approximately 90% for the Institutional Offering and 10% for the Retail Offering. However, the final allocation between the offerings will be determined by the Company and the Managers following the expiry of the Bookbuilding Period/Application Period based on the number and size of applications received in the respective offerings relative to the total number and size of applications received in the Offering. |
| | In the Institutional Offering, the Board will determine the allocation of Offer Shares after consultation with the Joint Lead Managers. |
| | In the Retail Offering, allocation will be made solely on a pro rata basis using the VPS' automated simulation procedures. However, the Company reserves the right, at its discretion, to limit the total number of applicants to whom Offer Shares are allocated. |
| Listing of the Shares | On May 14, 2012, the Company applied for admission to trading of its Shares on the Oslo Stock Exchange, or alternatively Oslo Axess. On June 13, 2012, the board of directors of Oslo Børs approved the listing application of the Company with certain conditions. |
| Conditions for completion of the Offering | Completion of the Offering is conditional upon |
| | • the Board approving the completion of the Offering including determining the final Offer Price, the number of Offer Shares to be issued by the Company and the allocation of the Offer Shares, |
| | • the Company satisfying the listing conditions for a listing on the Oslo Stock Exchange (alternatively Oslo Axess), and |
| | • the Transaction being closed on the Closing Date |
| Lock-up | DNB Markets, on behalf of the Joint Lead Managers, has entered into a lock-up agreement with Geden, under which Geden has agreed not to offer, sell, contract to sell or otherwise dispose of its Shares for a period of 12 months from the first day of listing without DNB Markets' prior written approval. |
| Payment and delivery | Payment by applicants in the Institutional Offering will take place against delivery of Offer Shares. Delivery and payment for Offer Shares is expected to take place on or about July 10, 2012. Delivery of the Offer |

Universal Maritime Inc. – Prospectus

Shares will, in order to facilitate delivery-versus-payment, be made by the delivery of existing and unencumbered Shares made available to the Managers by Geden pursuant to a share lending agreement. Delivery of such Borrowed Shares shall constitute a full discharge of the Company's obligation to deliver the Offer Shares to the applicants and the Offer Shares allocated in the Institutional Offering will be issued to the Managers and used to fulfil their obligation to redeliver the Borrowed Shares to Geden.

It is expected that payment for, and delivery of, the Offer Shares in the Retail Offering will be made on or about July 9, 2012 and on or about July 10, 2012 respectively.

| | |
|---|---|
| First day of trading | Expected first day of trading is on or about July 12, 2012. |
| International Securities Identification Number (ISIN) | MHY929741079 |
| Trading symbol | "UMAR" |
| Expenses | The transaction costs for the Company related to the Offering are estimated to be in the region of $7.635 million to $8.910 million given the Offering interval. 75% of the net profit, if any, of the stabilisation activities shall be for the account of the Company. The remaining 25% shall be for the account of the Joint Lead Managers. The net proceeds prior to any net profit from stabilisation activities, provided that a $ amount equal to the upper end of the Offering interval is applied for and allocated in the Offering, will be approximately $191.1 million. |

No expenses or taxes will be charged by the Company or the Managers to the applicants in the Offering.

### 1.10     Managers

DNB Markets, Fearnley Fonds and RS Platou Markets are acting as Joint Lead Managers and Joint Bookrunners for the Offering. DVB Capital Markets is acting as Financial Advisor

### 1.11     Auditor and advisors

The Company's auditor is KPMG Akis Bagimsiz Denetim ve SMMM AS, with a registered business address at Kavacik Ruzgarli Bahce Mahallesi Kavak Sokak No:29 Beykoz 34805 Istanbul. KPMG Turkey has been the Company's auditor since its incorporation.

Advokatfirmaet Wiersholm AS is acting as Norwegian legal advisor to the Company as to Norwegian law and Seward & Kissel LLP is acting as U.S. and Marshall Islands counsel to the Company as to matters of U.S. and Marshall Islands law. Advokatfirmaet Schjødt AS is acting as Norwegian legal advisor to the Managers.

### 1.12     Documents on display

For 12 months from the date of this Prospectus, copies of the following documents will be available for inspection at the Company's registered office during normal business hours from Monday through Friday each week (except public holidays):

- the Bylaws and Articles of Incorporation of the Company;

- Universal's audited consolidated financial statements for the period from its inception to December 31, 2011;

- Universal's unaudited interim consolidated financial statements as of and for the three months ended March 31, 2012 and from March 3, 2011 (the date of inception) to March 31, 2011;

- The combined financial statements of the Predecessor Companies as of and for the years ended December 31, 2011, 2010 and 2009;

- The unaudited combined interim financial statements of the Predecessor Companies for the three months ended March 31, 2012 and 2011

- valuation report of the Initial Fleet on charter free delivery, as between a willing seller and a willing buyer for cash payment under normal commercial terms provided by Clarkson Valuations Limited; and

- this Prospectus.

### 1.13    Summary of financial information and operating and financial review

The following tables represent the audited consolidated financial statements for Universal as of December 31, 2011 and the unaudited consolidated financial statements for the period from March 3, 2011 (the date of inception) to December 31, 2011, and as of and for the three month period ended March 31, 2012.

Universal's audited consolidated financial statements as of December 31, 2011 and for the period from March 3, 2011 (the date of inception of the Company) to December 31, 2011, and unaudited consolidated financial statements as of and for the three month period ended March 31, 2012 are attached to this Prospectus as Appendix D and E.

For information regarding the basis of preparation of the financial information, refer to the financial statements attached into this Prospectus as Appendix B, C, D and E.

#### 1.13.1    Consolidated statement of operations

The table below sets out information derived from the audited USGAAP consolidated statements of operations for Universal for the period March 3, 2011 (date of inception) through December 31, 2011 and the unaudited USGAAP interim consolidated statement of operations for the three month period ended March 31, 2012.

| | March 3, 2011- December 31, | Three Month Period Ended March 31, |
|---|---|---|
| **Consolidated Statements of Operations** | **2011** | **2012** |
| *(in thousands of $, except share data)* | | |
| Revenues | -- | -- |
| Operating expense--General and administrative expenses | (2,621) | (257) |
| Depreciation expense | (2) | (2) |
| **Operating loss** | **(2,623)** | **(259)** |
| Other income / (expense)--Foreign currency income/(expense), net | 3 | (6) |
| **Net loss** | **(2,620)** | **(265)** |
| Net loss per share (Basic and diluted) | (5) | (1) |
| Weighted average capital shares outstanding | | |
| (Basic and diluted) | 500 | 500 |

#### 1.13.2    Consolidated balance sheet

The table below sets out information derived from the audited USGAAP consolidated balance sheet for Universal as of December 31, 2011 and the unaudited USGAAP interim consolidated balance sheet as of March 31, 2012.

| **Consolidated Balance Sheet** | | |
|---|---|---|
| *(in thousands of $, except share data)* | **March 31, 2012** | **December 31, 2011** |
| **Assets** | | |
| **Current assets** | | |
| Cash and cash equivalents | 5 | 11 |
| Other current assets | 7 | 6 |
| **Total current assets** | **12** | **17** |
| **Non-current assets** | | |

Universal Maritime Inc. – Prospectus

| | | |
|---|---|---|
| Leasehold improvements, net | 19 | 20 |
| Furniture and fixtures, net | 23 | 20 |
| Deferred registration costs | 12 | -- |
| **Total non-current assets** | **54** | **40** |
| **Total assets** | **66** | **57** |
| **Liabilities and Shareholder's Deficit** | | |
| **Current liabilities** | | |
| Accounts payable | 705 | 691 |
| Accrued expenses | 54 | 115 |
| **Total current liabilities** | **759** | **806** |
| **Non-current liabilities** | | |
| Due to related parties | 2,192 | 1,871 |
| **Total non-current liabilities** | **2,192** | **1,871** |
| **Total liabilities** | **2,951** | **2,677** |
| *Commitments and Contingencies* | | |
| **Shareholder's deficit** | | |
| Capital stock, par value $0.01; 500 shares authorized, issued and outstanding | 0.05 | 0.05 |
| Additional paid-in capital | 0.5 | 0.5 |
| Accumulated deficit | (2,885) | (2,620) |
| **Total shareholder's deficit** | **(2,885)** | **(2,620)** |
| **Total liabilities and shareholder's deficit** | **66** | **57** |

*1.13.3   Consolidated Statement of Changes in Shareholder Deficit and Comprehensive Loss*

The table sets out below is derived from the audited USGAAP consolidated statement of changes in shareholder's deficit and comprehensive loss for Universal for the period March 3, 2011 (date of inception of the Company) through December 31, 2011, and the unaudited USGAAP interim consolidated statement of changes in shareholder deficit and comprehensive loss for Universal for the three month period ended March 31, 2012.

**Consolidated statement of changes in shareholder deficit and comprehensive loss**
*(in thousands of $, except share data)*

| | Shares | Capital Stock | Additional Paid-in Capital | Accumulated Deficit | Total Shareholder's Deficit | Comprehensive Loss |
|---|---|---|---|---|---|---|
| Balances as of March 3, 2011 | -- | -- | -- | -- | -- | -- |
| Net Loss | -- | -- | -- | (2,620) | (2,620) | (2,620) |
| Issuance of capital stock | 500 | 0.05 | 0.5 | -- | 0.5 | -- |
| Balances as of December 31, 2011 | 500 | 0.05 | 0.5 | (2,620) | (2,620) | (2,620) |
| Net Loss | -- | -- | -- | (265) | (265) | (265) |
| **Balances as of March 31, 2012** | **500** | **0.05** | **0.5** | **(2,885)** | **(2,885)** | **(2,885)** |

*1.13.4   Combined statement of operations*

The table below sets out amount that were derived from the audited USGAAP combined statements of operations for Predecessor Companies for the years ended December 31, 2011, 2010 and 2009 and the unaudited USGAAP interim combined statements of operations for the Predecessor Companies for the three month period ended March 31, 2012 and 2011.

| Combined Statements of Operations *(in thousands of $)* | Year Ended December 31, | | | Three Month Period Ended March 31, | |
|---|---|---|---|---|---|
| | **2011** | **2010** | **2009** | **2012** | **2011** |
| Revenues | 72,071 | 55,356 | 2,613 | 22,928 | 16,597 |
| Vessel voyage expenses | (18,421) | (15,941) | (171) | (4,765) | (4,819) |
| **Net voyage revenues** [(1)] | **53,650** | **39,415** | **2,442** | **18,163** | **11,778** |

Universal Maritime Inc. – Prospectus

| | | | | | |
|---|---|---|---|---|---|
| Vessel operating expenses | (21,002) | (12,669) | (1,502) | (6,126) | (4,677) |
| Depreciation expense | (21,388) | (11,413) | (1,196) | (6,461) | (4,435) |
| General and administrative | | | | | |
|     Expenses | (1,447) | (699) | (161) | (231) | (235) |
| **Income/(loss) from** | | | | | |
|     **Operations** | **9,813** | **14,634** | **(417)** | **5,345** | **2,431** |
| Interest expense | (10,823) | (5,239) | (547) | (3,657) | (1,847) |
| Interest income | 6 | -- | -- | 17 | -- |
| Foreign currency exchange | | | | | |
| Income/(expense), net | (16) | 1 | (4) | 15 | (20) |
| Other finance costs | (183) | (10) | (1) | (84) | (17) |
| Others, net | -- | 2 | -- | -- | -- |
| **Net income/(loss)** | **(1,203)** | **9,388** | **(969)** | **1,636** | **547** |

[1] Non-GAAP measurement. Net voyage revenues are revenues minus vessel voyage expenses. Vessel voyage expenses primarily consist of port, canal and fuel costs that are unique to a particular voyage, which would otherwise be paid by the charterer under a time charter.

### 1.13.5   Combined balance sheet

The table below sets out information derived from the audited USGAAP combined balance sheets for the Predecessor Companies as of December 31, 2011, 2010 and 2009 and the unaudited combined balance sheet for the Predecessor Companies as of March 31, 2012.

| Combined Balance Sheet (in thousands of $) | March 31, 2012 | December 31, 2011 | December 31, 2010 | December 31, 2009 |
|---|---|---|---|---|
| **Assets** | | | | |
| **Current assets** | | | | |
| Cash and cash equivalents | 13,934 | 11,651 | 4,051 | 2,998 |
| Accounts receivables, net and unbilled revenue | 4,808 | 3,461 | 5,920 | -- |
| Deferred financing charge | 305 | 305 | 63 | 63 |
| Inventories | 3,984 | 4,789 | 2,103 | 496 |
| Due from related parties | -- | -- | 7,830 | 8,078 |
| Other current assets | 1,523 | 701 | 647 | 88 |
| **Total current assets** | **24,554** | **20,907** | **20,614** | **11,723** |
| **Non-current assets** | | | | |
| Deferred financing charge | 1,757 | 1,833 | 547 | 609 |
| Other non-current assets | 7,017 | 6,989 | -- | -- |
| Property and equipment | | | | |
| Vessels | 710,254 | 710,254 | 429,359 | 136,002 |
| Vessels under construction | -- | -- | 81,583 | 160,043 |
| | 710,254 | 710,254 | 510,942 | 296,045 |
| Less: accumulated depreciation | (40,457) | (33,996) | (12,609) | (1,196) |
| Net property and equipment | 669,797 | 676,258 | 498,333 | 294,849 |
| **Total assets** | **703,125** | **705,987** | **519,494** | **307,181** |
| **Liabilities and invested equity** | | | | |
| **Current liabilities** | | | | |
| Current instalments of long-term debt | 54,697 | 29,539 | 27,379 | 11,195 |
| Due to related parties | 357 | 238 | 882 | -- |
| Accounts payable | 9,277 | 9,010 | 6,488 | 1,407 |
| Deferred revenue | 2,605 | 2,532 | 965 | 795 |
| Other liabilities | 1,249 | 1,412 | 804 | 198 |
| **Total current liabilities** | **68,185** | **42,731** | **36,518** | **13,595** |
| **Non-current liabilities** | | | | |
| Due to related parties | 244,818 | 242,655 | 168,415 | 151,473 |
| Long-term debt, excluding currents installments | 352,050 | 384,165 | 276,922 | 113,862 |
| **Total liabilities** | **665,053** | **669,551** | **481,855** | **278,930** |
| **Invested equity** | | | | |
| Share capital | 13.5 | 13.5 | 13.5 | 13.5 |
| Retained earnings | 38,058 | 36,422 | 37,625 | 28,237 |
| **Total invested equity** | **38,072** | **36,436** | **37,639** | **28,251** |
| **Total liabilities and invested Equity** | **703,125** | **705,987** | **519,494** | **307,181** |

Universal Maritime Inc. – Prospectus

*1.13.6    Combined invested equity*

The table set out below is derived from the audited combined statement of invested equity for the Predecessor Companies for the three years ended December 31, 2011, 2010 and 2009, the unaudited combined interim statement of invested equity for the Predecessor Companies for the three month periods ended March 31, 2012 and 2011.

| **Combined invested equity** *(in thousands of  $)* | **Share capital** | **Retained earnings** | **Total invested equity** |
|---|---|---|---|
| Balances as of January 1, 2009 | 13.5 | 29,206 | 29,219 |
| Net loss | -- | (969) | (969) |
| Comprehensive income | | | (969) |
| Balances as of December 31, 2009 | 13.5 | 28,237 | 28,251 |
| Net income | -- | 9,388 | 9,388 |
| Comprehensive income | | | 9,388 |
| Balances as of December 31, 2010 | 13.5 | 37,625 | 37,639 |
| Net income | -- | 547 | 547 |
| Comprehensive income | | | 547 |
| Balances as of March 31, 2011 | 13.5 | 38,172 | 38,186 |
| Net income | -- | (1,750) | (1,750) |
| Comprehensive income | | | (1,750) |
| Balances as of December 31, 2011 | 13.5 | 36,422 | 36,436 |
| Net income | -- | 1,636 | 1,636 |
| Comprehensive income | | | 1,636 |
| **Balances as of March 31, 2012** | **13.5** | **38,058** | **38,072** |

*1.13.1    Combined cash flow statements*

The table set out below is derived from the audited Combined Statement of Cash Flows for the Predecessor Companies for the three years ended December 31, 2011, 2010 and 2009 and the unaudited Combined Interim Statement of Cash Flows for the Predecessor Companies for the three month periods ended March 31, 2012 and 2011.

| | **Year Ended December 31,** | | | **Three Month Period Ended March 31,** | |
|---|---|---|---|---|---|
| **Combined cash flow statements** *(in thousands of $)* | **2011** | **2010** | **2009** | **2012** | **2011** |
| ***Cash flows provided by /(used in) operating activities*** | | | | | |
| Net income /(loss) | (1,203) | 9,388 | (969) | 1,636 | 547 |
| ***Adjustments to reconcile net income /(loss) to cash provided by /(used in) operating activities:*** | | | | | |
| Depreciation of property and Equipment | 21,388 | 11,412 | 1,196 | 6,461 | 4,435 |
| Amortization of deferred revenue | (965) | (795) | -- | (2,532) | (965) |
| Deferred financing charge | 163 | -- | -- | 76 | 17 |
| ***Changes in operating assets and liabilities:*** | | | | | |
| Accounts receivables | 2,459 | (5,920) | -- | (1,347) | (1,152) |
| Inventory | (2,686) | (1,607) | (496) | 805 | (1,072) |
| Other current assets | (53) | (560) | (85) | (823) | (1,690) |
| Other non-current assets | (6,988) | -- | -- | (28) | (89) |
| Other current liabilities | 607 | 606 | 192 | (163) | 1,103 |
| Due to related parties | (644) | 882 | -- | 119 | (882) |
| Accounts payable | 2,523 | 5,081 | 1,394 | 266 | 10,577 |
| Deferred revenue | 2,532 | 965 | 795 | 2,605 | 1,461 |
| **Net cash provided by operating Activities** | **17,133** | **19,452** | **2,027** | **7,075** | **12,290** |
| ***Cash flows from investing activities:*** | | | | | |
| Capital expenditures | (199,275) | (214,834) | (141,029) | -- | (25,401) |
| **Net cash used in investing** | **(199,275)** | **(214,834)** | **(141,029)** | **--** | **(25,401)** |

| Activities | | | | | |
|---|---|---|---|---|---|
| **Cash flows from financing activities:** | | | | | |
| Proceeds from long-term debt | 138,755 | 193,058 | 61,103 | -- | 8,480 |
| Repayments on debt to banks | (29,351) | (13,814) | (804) | (6,955) | (4,079) |
| Changes in due from related parties | 7,830 | 248 | (14) | -- | 206 |
| Deferred financing charge | (1,730) | -- | -- | -- | (50) |
| Changes in due to related parties | 74,238 | 16,943 | 81,712 | 2,163 | 11,403 |
| **Net cash provided by financing Activities** | **189,742** | **196,435** | **141,997** | **(4,792)** | **15,960** |
| **Net increase in cash and cash Equivalents** | 7,600 | 1,053 | 2,995 | 2,283 | 2,849 |
| Cash and cash equivalents at beginning of the year | 4,051 | 2,998 | 3 | 11,651 | 4,051 |
| **Cash and cash equivalents at end of the year** | **11,651** | **4,051** | **2,998** | **13,934** | **6,900** |
| **Supplemental information** | | | | | |
| Cash paid for interest during the period | 9,769 | 7,767 | 3,273 | 3,368 | 1,513 |
| Capitalized interest cost and financing charges added to capital expenditures as a non-cash item | 37 | 341 | 63 | -- | 5 |
| Additions to capital expenditures incurred with accounts payable | 594 | 469 | 962 | -- | 8,539 |

### 1.14    Significant changes and trends

In addition to the effect of the Offering as described in this Prospectus, the New Debt Facility, discussed in Section 13.11.2 "Operational and financial review—Capital resources—The New Debt Facility" will have an effect on Universal's capital structure.

Other than this, there have been no significant changes in the financial or trading position of Universal following March 31, 2012 and Universal has not experienced any changes or trends that are considered significant since December 31, 2011 and to the date of this Prospectus.

### 1.15    Capitalization and indebtedness

See Section 13.10 "Operational and financial review—Capitalization and indebtedness" for information regarding the Company's capitalization and indebtedness.

### 1.16    Summary of risk factors

Investing in the Shares involves inherent risks. Below is a brief summary of the risk factors described in Section 2 "Risk factors".

If any of the risks described below materialize, individually or together with other circumstances, they may have a material adverse effect on Universal's business, financial condition, results of operations and cash flow, which may cause a decline in the value and trading price of the Shares that could result in a loss of all or part of any investment in the Shares.

- Risks relating to Universal and the industry in which Universal operates

    - If the tanker industry, which historically has been cyclical, is depressed in the future, Universal's earnings and available cash flow may be adversely affected.

    - Changes in the oil markets could result in decreased demand for Universal's vessels and services, which could adversely affect the business, results of operations, cash flows and financial condition.

    - Universal may be exposed to the cyclicality and volatility of the spot charter market in the future, which could have a material adverse impact on its profitability, cash flow and financial position.

- Universal's vessels and its cargoes will be subject to the inherent operational risks of the tanker industry and Universal may experience negative consequences, including unexpected damages, costs, delays or the total loss of its vessels or their cargoes, which may adversely affect its business and financial condition.

- Universal intends to operate its vessels worldwide and, as a result, the vessels will be exposed to security and customs inspection procedures of different countries, which may increase its expenses and adversely affect its operating results.

- Universal is subject to complex laws and regulations, including environmental laws and regulations that can adversely affect its business, results of operations, cash flows and financial condition.

- If Universal fails to comply with international safety regulations, it may be subject to increased liability, which may adversely affect its insurance coverage and may result in a denial of access to, or detention in, certain ports.

- Political instability, terrorist or other attacks, war or international hostilities can affect the tanker industry, which may adversely affect Universal's business, results of operations, cash flows and financial condition.

- A renewed contraction or worsening of the global credit markets and the resulting volatility in the financial markets could have a material adverse effect on Universal's business, results of operations, cash flows and financial condition.

- Changes in fuel, or bunkers, prices may adversely affect profits.

- An increase in operating costs could adversely affect the business, results of operations, cash flows and financial condition.

- The market values of Universal's vessels may decrease, which could cause Universal to breach covenants in its debt facilities and adversely affect the business, results of operations, cash flows and financial condition.

- Acts of piracy on ocean-going vessels have recently increased in frequency, which could adversely affect Universal's business, results of operations and financial condition.

- Universal may be subject to increased costs as a result of a worldwide shortage of qualified and trained ship officers and crew.

- Maritime claimants could arrest Universal's vessels, which would have a negative effect on its cash flow and ability to pay dividends.

- If labor interruptions are not resolved in a timely manner, they could have a material adverse effect on Universal's business, results of operations and financial condition.

- Company-specific risk factors

  - As a new company, Universal has no operating history and may not be able to implement its business strategy successfully.

  - As the main charterer of Universal's vessels, if Shell fails to perform its obligations under the timecharters, Universal's business, results of operations, cash flows and financial condition could be adversely affected.

  - Shell as charterer of eight of Universal's ten vessels will be entitled to cancel all time charters for these vessels under certain events, including but not limited to in the event of an insolvency event in the Company or Geden (as long as Geden holds more than 20% of the shares in the Company), in the event of a change of control in the Company (other than in connection with the settlement of this Offering) and upon the occurrence of a material adverse change with respect to the Company, and such a cancellation may adversely affect Universal's business, results of operations, cash flows and financial condition.

- As the majority of Universal's vessels are chartered to Shell, any default of Universal's obligations under the time charters may adversely affect Universal's business, results of operations, cash flows and financial condition.

- Delays in deliveries of any additional vessels Universal may acquire in the future, the decision to cancel an order for purchase of a vessel or the inability to otherwise complete the acquisitions of vessels for the fleet could harm operating results.

- Any acquisition of a vessel may not be profitable at or after the time it is acquired.

- Any failure to fund capital expenditure requirements could have a material adverse effect on the business, results of operations and financial condition.

- Servicing current or future indebtedness limits funds available for other purposes and if Universal cannot service its debt, it may be forced to sell its vessels.

- The New Debt Facility imposes restrictions on Universal that could have a material adverse effect on Universal's business, results of operation, cash flow, financial condition and ability to pay dividends.

- Certain of Universal's agreements are subject to change of control provisions.

- Changes to the financial status of Geden and GDAS could have material adverse effect on Universal's business, results of operation, cash flow, financial condition and ability to pay dividends, and since Geden and GDAS are privately held companies little information regarding them will be publicly available.

- Universal may be unsuccessful in competing in the highly competitive international tanker market, which would negatively affect its business, results of operations, cash flows and financial condition.

- Universal will have directors who also serve as directors and executive officers of Geden/GDAS, which may create conflicts of interest that negatively affect the business, results of operations, cash flows and financial condition.

- Geden may compete with Universal for business opportunities that would otherwise benefit Universal or influence GDAS's performance as one of Universal's managers, either of which could have a material adverse effect on Universal's business, results of operations, cash flows and financial condition.

- Universal may be unable to attract and retain key management personnel and other employees in the shipping industry, which may negatively affect the business, results of operations and financial condition.

- Universal and its subsidiaries may be subject to group liability for damages or debts owed by one of the subsidiaries or by Universal.

- Universal may not have adequate insurance to compensate it if Universal loses its vessels or to compensate third parties.

- The failure to maintain class certifications of authorized classification societies on one or more vessels would affect the ability to employ such vessels, which could negatively impact the business, results of operations and financial condition.

- Risk of unexpected incidents and occurrences.

- Anti-takeover provisions in the Company's organizational documents could make it difficult for shareholders to replace or remove the Company's current Board or could have the effect of discouraging, delaying or preventing a merger or acquisition, which could adversely affect the market price of the Shares.

- Universal may incur challenges and costs associated with the separation of the SPVs from Geden and the Listing

- Risks relating to the Shares.

- The price of the Shares may fluctuate significantly.

- There is no existing market for the Shares, and a trading market that provides adequate liquidity may not develop.

- Geden will be a major shareholder at completion of the Offering.

- Future sales of Shares by the Company's major shareholder or any of its primary insiders may depress the price of the Shares.

- Future issuances of Shares or other securities may dilute the holdings of shareholders and could materially affect the price of the Shares.

- Investors may not be able to exercise their voting rights for Shares registered in a nominee account.

- Shareholders may not have the same rights or protections that a shareholder in a corporation incorporated in another jurisdiction may have.

- Because the Company is organized under the laws of Marshall Islands, U.S. investors, Norwegian investors and investors in other jurisdictions may face difficulties in protecting their interests, and their ability to protect their rights through the Norwegian courts, the U.S. federal courts and the courts of such other jurisdictions may be limited.

- The transfer of Shares is subject to restrictions under the securities laws of the United States and other jurisdictions.

- Exchange risk for shareholders.

- Various conditions may cause an adverse tax effect for the shareholder if the Company pays dividends.

- United States tax authorities could treat the Company as a "passive foreign investment company," which could have adverse United States federal income tax consequences to United States shareholders.

- The Company may have to pay United States federal income tax on United States source income, which would reduce its earnings.

*2.2.19   Risk of unexpected incidents and occurrences*

Although Universal tries to keep an overview of all known risks related to its operations, there is a risk that Universal will be subject to unexpected incidents and occurrences resulting from additional risks and uncertainties that Universal currently believes are immaterial, unlikely or that are not presently known to Universal. Such incidents and occurences may also have a material adverse effect on its business, financial condition, results of operations and cash flow.

*2.2.20   Anti-takeover provisions in the Company's organizational documents could make it difficult for shareholders to replace or remove the Company's current Board or could have the effect of discouraging, delaying or preventing a merger or acquisition, which could adversely affect the market price of the Shares*

Several provisions of the Company's amended and restated articles of incorporation (the "**Articles of Incorporation**") and amended and restated bylaws (the "**Bylaws**") could make it difficult for the Company's shareholders to change the composition of the Board, preventing them from changing the composition of Universal's management. In addition, the same provisions may discourage, delay or prevent a merger or acquisition that shareholders may consider favorable. Among other things, these provisions:

- provide for a classified Board with staggered, three-year terms;
- for a period of five years following the first annual meeting of shareholders after the completion of this Offering, authorize the removal of directors only for cause and only upon the affirmative vote of at least two-thirds of the votes cast at an annual meeting of shareholders;
- prohibit shareholder action unless such action is effectuated at an annual or special meeting of the shareholders or by a written consent that is signed by all shareholders entitled to vote on the action; and
- establish an advance notice requirement of 60 to 90 days prior to the one-year anniversary date of the preceding annual meeting of shareholders for nominations for election to the Board or for proposing matters that can be acted on by shareholders at shareholder meetings.

The Bylaws state that the Board may fix a time not more than sixty nor less than fifteen days prior to the day of any meeting of shareholders as the time as of which shareholders entitled to notice of and to vote at such meeting shall be determined.

For further details on the anti-takeover provisions of the Company, please see Section 17.7.12 "Description of the Shares and share capital—The Articles of Incorporation, the Bylaws and Marshall Islands law—Anti-takeover effect of certain provisions of the Articles of Incorporation and the Bylaws".

*2.2.21   Universal may incur challenges and costs associated with the separation of the SPVs from Geden and the Listing*

At the date of this Prospectus, the SPVs who own the vessels in the Initial Fleet are owned by Geden. The Company may in connection with the transfer of the SPV's (and related rights and obligations as part of this) from Geden be subject to unforeseen and/or unexpected separation issues, and Universal may also incur challenges and increased costs due to organization disruptions, the implementation of new routines and new personnel. As an independent entity, there is also a risk Universal may further incur additional operating, capital and financial expenses (or be unable to retain revenue levels) compared to that which could be achieved as a member of the Geden group.

In respect of the technical operation and crewing of the vessels in the Initial Fleet, the situation will remain unchanged. The Initial Fleet will continue to be operated by GDAS as technical/crewing manager pursuant to separate technical management agreements with a duration expiring when the underlying charters expire. In respect of the commercial management of the SPVs and their vessels, including but not limited to the employment of the vessels, supervision of compliance with contracts, supervision of the technical manager, accounting for the SPVs and the responsibility thereof will be transferred from Geden to Universal upon the Company's acquisition of the SPVs. It is possible that Universal may incur higher commercial operational costs in

the future compared to the commercial operational costs the SPVs incurred when owned by Geden, due to the need for stand-alone corporate and support services and less access to financial and other resources compared to those available to it as a subsidiary of Geden.

The Offering and Listing may also generate additional costs and regulatory requirements for the Company. As a consequence of the Listing on the Oslo Stock Exchange, the Company will be required to meet regulatory requirements of the Oslo Stock Exchange, in particular with respect to financial reporting. The Company will incur additional costs as a result of the cost of its Listing and the costs associated with the staff and resources required to assist the Company in complying with those requirements and in liaising with investors and shareholders. In addition, the Company will incur further costs as a result of the more formal internal structure and corporate governance regime which it will be required to follow as a listed company. New regulatory initiatives applicable to listed companies may create additional costs in the future.

### 2.3 Risks relating to the Shares

#### 2.3.1 The price of the Shares may fluctuate significantly

The trading price of the Shares could fluctuate significantly in response to a number of factors beyond Universal's control, including, but not limited to, quarterly variations in operating results, adverse business developments, changes in financial estimates and investment recommendations or ratings by securities analysts, or any other risk discussed herein materializing or the anticipation of such risk materializing.

In recent years, the global stock markets have experienced extreme price and volume fluctuations. This volatility has had a significant impact on the market price of securities issued by many companies. Those changes may occur without regard to the operating performance of these companies. The price of the Shares may therefore fluctuate based upon factors that have little or nothing to do with Universal.

#### 2.3.2 There is no existing market for the Shares, and a trading market that provides adequate liquidity may not develop

Prior to the Offering, there was no public market for the Shares, and there can be no assurance that an active trading market will develop, or be sustained or that the Shares may be re-sold at or above the Offer Price. The market value of the Shares could be substantially affected by the extent to which a secondary market develops for the Shares following the completion of the Offering. However, in parallel and subsequent to the Offering, the Company will be in an application process which has the objective to list the Shares on a regulated market place in order to obtain liquidity in the Share, i.e. the Oslo Stock Exchange (or alternatively Oslo Axess).

#### 2.3.3 Geden will be a major shareholder at completion of the Offering

Following completion of the Offering, it is expected that Geden will be a major shareholder of the Company as further described Section 5.2 "The acquisition of the Initial Fleet—The Acquisition Agreement". Given their major shareholdings they may have the ability to influence the outcome of matters submitted for the vote of the Company's shareholders, including election of members of the Board. The commercial goals of Geden as shareholder, and those of Universal, may not always remain aligned.

#### 2.3.4 Future sales of Shares by the Company's major shareholder or any of its primary insiders may depress the price of the Shares

The market price of the Shares could decline as a result of sales of a large number of Shares in the market after the Offering or the perception that such sales could occur, or any sale of Shares by any of the Company's primary insiders from time to time. Such sales, or the possibility that such sales may occur, might also make it more difficult for the Company to sell equity securities in the future at a time and at a price it deems appropriate. Although the Company's largest shareholder as of the date of this Prospectus, Geden, is subject to an agreement with the Joint Lead Managers that restricts its ability to sell or transfer its Shares until June 2013, the representatives of the Joint Lead Managers may, in their sole discretion and at any time, waive the restrictions on sales or transfer during this period. Additionally, following this period, all Shares owned by Geden will be eligible for sale in the public market, subject to applicable securities laws restrictions.

## 5 THE ACQUISITION OF THE INITIAL FLEET

### 5.1 Background

Geden is a limited company incorporated under the laws of the Republic of Malta. It is a major owner and operator of crude oil tankers, product tankers and dry-bulk vessels. Geden's business address is 85 St. John Street, Valetta, VLT 1165, Malta.

The Company was incorporated in the Marshall Islands in March 2011. From its incorporation the Company has been a wholly owned subsidiary of Geden, and it will remain so until completion of the Offering. The Company was incorporated by Geden for the purpose of using it as the corporate vehicle for a spin-off of a majority of its crude oil tanker fleet. The decision to complete such reorganisation was based on a desire to let the business segment develop independently from Geden's other activites by, *inter alia*, allowing it to access the public equity market.

### 5.2 The Acquisition Agreement

The spin-off of the majority of Geden's crude oil tanker fleet will take the form of an acquisition by the Company of all shares in the current subsidiaries of Geden owning the vessels constituting the Initial Fleet (the "**Transaction**"). In so doing, the Company will also take over the debt of these subsidiaries as of the closing of the acquisition and the arrangements under which the Initial Fleet is employed.

The consideration payable to Geden will take the form of new Shares.

The Company will, immediately following closing of the acquisition, refinance the debt of the subsidiaries acquired. This will be financed by a new bank loan and a part of the proceeds from the Offering.

The Company and Geden are parties to an acquisition agreement dated May 28, 2012 as subsequently amended (the "**Acquisition Agreement**"), pursuant to which the Company will acquire from Geden all of the outstanding shares in the ten Predecessor Companies, owning 5 modern suezmax tankers and 5 modern aframax tankers (the "**Initial Fleet**"). The Initial Fleet is further described in Section 10.3 "Business overview—Fleet overview".

In doing so, the Company will also take over the contracts under which the Initial Fleet are employed, their interest bearing debt (the "**Current Debt Facilities**") and an obligation to reimburse Geden for all costs incurred by Geden in setting up the Transaction.

Two of the vessels constituting the Initial Fleet are chartered out to ST Shipping while the other eight vessels constituting the Initial Fleet are chartered out to Shell. The charter arrangements with ST Shipping have been allocated a positive value in view of the rates therein being above market levels. The arrangement with Shell have been allocated a negative value due to Shell's right to participate in the equity value of the Initial Fleet going forward pursuant to the Master Umbrella Agreement.

The shares in the 10 SPVs will, subject to the Company raising minimum $170 million in the Offering and customary conditions precedents, be transferred to the Company on July 9, 2012 (the "**Closing Date**"). This is one day prior to the settlement date in the Institutional Offering. The Closing Date will be moved correspondingly if the this settlement date is moved.

The initial purchase price for the shares in the 10 SPVs is agreed to be $106,106,470 (the "**Initial Purchase Price**") and will be settled on the Closing Date through the issuance of 10,610,647 Shares in the Company to Geden at a subscription price of $10 (the "**Consideration Shares**").

The Initial Purchase Price reflects:

Universal Maritime Inc. – Prospectus

(i)      a valuation of the Initial Fleet at $480,250,000 on a charter free basis provided by Clarkson Valuations Limited ("**Clarkson**") as of May 21, 2012 (the "**Valuation**")[1]. A copy of the valuation is attached as Appendix F to this Prospectus;

(ii)     a valuation of the timecharters with ST Shipping of $29,750,000 being the net present value of the difference between the prevailing market rate for timecharters of 3 year duration and the aggregate fixed rates under the timecharters with ST Shipping, Geden's guarantees for the outcome of the disputes, as described in Section 10.7 "Business overview—Litigation and disputes", included;

(iii)    the existing debt in the SPVs at the Closing Date being $395.8 million (being the aggregate of principal and interest accrued as of the Closing Date and such costs as will be incurred as a consequence of the prepayment thereof) (the "**Existing Debt**");

(iv)     the value of the obligations towards Shell in the Master Umbrella Agreement (which allows Shell to participate in the equity value of the Initial Fleet by receiving warrants to subscribe for Shares, as further described in Section 10.5.1 "Business overview—Material agreements—Master Umbrella Agreement") being at $5.1 million; and

(v)      reimbursable costs incurred and accrued as of March 31, 2012 as described in more detail in Section 15.8 "Related party transactions—Sponsor Loan and Guarantee Agreement" estimated to be $2.9 million.

The Existing Debt shall be repaid on the first Business Day following the Closing Date by using part of the proceeds from the Offering and drawdown under the New Debt Facility described in Section 13.11.2 "Operational and financial review—Capital resources—The New Debt Facility".

The Transaction shall have the same economical effect as if the Company had purchased the Initial Fleet, the time charters with ST Shipping, the charter agreements with Shell and the obligations specifically assumed. Accordingly, the Predecessor Companies will be acquired based on the premise that their consolidated net working capital position (excluding the value of the Initial Fleet, the Existing Debt and the other obligations specifically assumed) is nil at closing of the Transaction. A net working capital adjustment mechanism set forth in the Acquisition Agreement shall ensure that this premise is met.

The Company will, following the issue of the Consideration Shares, have an issued share capital of $106,111.47 divided into 10,611,147 ordinary shares, each with a par value of $0.01. All the Shares will be held by Geden.

Furthermore, Geden will subscribe for up to 2 million Offer Shares in the Offering. Assuming that the final subscription price in the Offering is set at the mid-point of the Indicative Price Range set out on the front page of the Prospectus, and assuming that Geden is allocated 2 million Offer Shares in the Offering, the number of Shares held by Geden following issuance of the Consideration Shares will give Geden an ownership interest in the Company following completion of the Offering of 37.68% if the amount raised is $200 million and 41.98% if the amount raised is $170 million, this being reduced to 35.27% and 39.43%respectively if the Over-Allotment Option is exercised in full. The Company is dependent upon the Acquisition Agreement as the Company will not own any operating assets if the Acquisition Agreement is not successfully closed.

---

[1] The Valuation is based on Clarkson's knowledge of recent transactions involving vessels of the same type as the vessels constitution the Initial Fleet and Clarkson's general market knowledge. The Valuation relates to the situation on the date thereof and is not a guide to the market value of the vessels at any other time. The vessels have been individually valued. If all of the vessels constituting the Initial Fleet were to be placed on the market simultaneously, no assurance can be given that the aggregate amount realisable would equal the amount of the Valuation. Market values of vessels are volatile and the Valuation must be considered in such perspective. Clarkson has not inspected the Initial Fleet as a basis for the Valuation.

## 6       THE OFFERING

### 6.1        Purpose of the Offering

The Offering is being pursued as part of the Company's strategy to establish Universal as an international shipping company through the acquisition and operation of modern Aframax and Suezmax tankers. The Company entered into the Acquisition Agreement with Geden on May 28, 2012 pursuant to which it will acquire the Initial Fleet through the purchase of all the shares in the Predecessor Companies. The gross proceeds of the Offering are expected to be minimum $170 million and maximum $200 million prior to exercise of the Over-Allotment Option.

The net proceeds of the Offering will partially be used, together with the New Debt Facility to repay the Existing Debt of approximately $395.8 million. The balance of the net proceeds will be used as follows: (i) approximately $4.8 million to cover the arrangement and structuring fee for the New Debt Facility, (ii) approximately $2.2 million to repay to Geden amounts drawn under the Sponsor Agreement and (iii) the remainder of the net proceeds, including any net proceeds received from the exercise of the Over-Allotment Option, for working capital purposes.

As part of this strategy, the Board and the Management, have decided to list the Company's Shares on the Oslo Stock Exchange or, alternatively, on Oslo Axess. The Offering will aim to bring the Company in compliance with the requirements for admission to trading on the Oslo Stock Exchange of having at least 500 shareholders (or, in the case of Oslo Axess, 100 shareholders) and a free float of at least 25% of the Shares. A stock exchange listing will provide a regulated market place for trading of the Shares. A listing of the Shares may also facilitate the use of the capital markets in order to raise equity should the Company wish to do so in the future, and allow the Company to use its Shares as transaction currency in future acquisitions, amalgamations and mergers, if any.

### 6.2        Overview of the Offering

The Offering consists of a global offer to raise an amount of minimum NOK 1,020 million and maximum NOK 1,200 million ($~170 million to $~200 million), through the issuance of minimum 19,428,571 and maximum 22,857,143 Offer Shares, each with a par value of $0.01 assuming that the Offer Price is set at the mid-point of the Indicative Price Range. The final number of Offer Shares to be issued will be dependent on the final amount to be raised in the Offering and the final Offer Price. The Offer Shares will upon issuance rank pari passu with the Company's existing Shares in all respects, and each will carry one vote per Share on a poll.

The Offering comprises:

- The Institutional Offering, in which Offer Shares are being offered to (i) institutional and professional investors in the EEA pursuant to the provisions of Article 3(2) of the EU Prospectus Directive 2003/71/EC, (ii) in the United States, to QIBs as defined in, and in reliance on, Rule 144A under the U.S. Securities Act and (iii) to institutional investors outside the EEA and the United States pursuant to applicable exceptions from local prospectus requirements; subject to a lower limit per application of an amount of NOK 1,000,000 for each investor.

- The Retail Offering, in which Offer Shares are being offered to the general public in Norway subject to a lower limit per application of an amount of NOK 10,500 and an upper limit per application of an amount of NOK 999,999 for each investor.

All offers and sales outside the United States will be made in reliance on Regulation S under the U.S. Securities Act.

This Prospectus does not constitute an offer of, or an invitation to purchase, the Offer Shares in any jurisdiction in which such offer or sale would be unlawful. For further details, see "Important Notice" on page i and Section 7 "Selling and transfer restrictions".

## 9 GROUP DESCRIPTION

### 9.1 Company Corporate information

Universal Maritime Inc. was incorporated under the laws of the Republic of Marshall Islands on March 3, 2011 with principal executive offices located at c/o UM (USA) LLC, 545 Madison Avenue, 9th floor, New York, NY 10022 U.S. and telephone number +1 (646) 833-0302. The Company's business registration number is 46163. The Company's website is www.universalmaritimeinc.com.

The Company's registered office is at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands MH96960. The name of the Company's registered agent at such address is The Trust Company of the Marshall Islands, Inc.

The Company owns 100% of UM (USA) LLC, a Delaware, U.S. limited liability company which was formed in March 2011 to carry out the commercial and strategic management of the fleet of Universal as well as perform certain administrative services. UM (USA) LLC maintains its principal executive offices at 545 Madison Avenue, 9th Floor, New York, NY 10022 U.S.A and employs the Company's Chief Executive Officer, Chief Financial Officer and Senior Vice-President.

### 9.2 History and important events

The Company has limited operating history, having been formed as a shell company by Geden on March 3, 2011 for the purposes of raising equity from outside investors to be used for the purchase of crude oil tanker vessels and eventually owning and operating such vessels. At the date of this Prospectus, all issued and outstanding capital stock of the Company is owned by Geden.

The Initial Fleet to be acquired by the Company is a part of a larger fleet operated by Geden. Geden's predecessor was founded in 1975 originally for the purpose of providing marine transportation service to the steel production operations, construction and heavy industry division of the Cukurova Group, a leading Turkish commercial conglomerate. Geden itself was incorporated in 2002.

Geden, incorporated in Malta, has since become a major global operator of crude oil tankers, product tankers and drybulk vessels. As of May 31, 2012, Geden owned a fleet of 45 vessels (inclusive of the ten vessels that will comprise Universal's Initial Fleet), consisting of 11 crude oil tankers, 10 product tankers, 14 drybulk vessels and 10 newbuildings that have not yet been delivered. Since 1999, Geden and its predecessors have entered into approximately 113 new shipbuilding contracts with large shipyards.

#### 9.2.1 Current Legal structure

The following figure illustrates Universal's current legal structure:



**9.3**       **Post Transaction and Offering organizational structure**

The following figure illustrates Universal's legal structure post-closing of the Transaction and the Offering:



As further described in Section 5.2 "The acquisition of the Initial Fleet—The Acquisition Agreement", Geden will receive 10,610,647 Shares in the Company as compensation for the sale of Initial Fleet. Furthermore, Geden will subscribe for up to 2 million Offer Shares in the Offering. Assuming that Geden is allocated 2 million Offer Shares in the Offering, Geden will have an ownership interest in the Company following completion of the Offering of at least 37.68% if the Company raises $200 million in the Offering and 41.98% if the Company raises $170 million in the Offering assuming final Offer Price is set in the mid-point of the Indicative Price Range set out on the front page of the Prospectus. Geden's ownership interest will be reduced to 35.27% and 39.43% respectively if the Over-Allotment Option is exercised in full.

The Company will following completion of the Transaction own 100% of the shares in the ten single purpose vessel owning companies (the Predecessor Companies) owning the Initial Fleet.

Genel Denizcilik Nakliyati A.S., or GDAS, an affiliate of the Çukurova Group that is affiliated with Geden, has agreed to perform the technical management of all the vessels in the Initial Fleet pursuant to an industry standard management agreement. The technical management agreements are further described in Section 15.4 "Related party transaction—Technical management agreements". GDAS has also entered into a service agreement with each of the Predecessor Companies. This service agreement is further described in Section 15.5 "Related party transaction—Service agreement".

GDAS currently provides technical management services for Geden's fleet, which currently consists of 44 tankers and drybulk carriers, inclusive of newbuilds and the Initial Fleet. GDAS maintains a staff of approximately 1,000 off-shore crew members and 120 shore-based personnel.

*9.3.1       Description of the Predecessor Companies and geographical presence*

All of the Predecessor Companies are incorporated under the laws of Malta

| Company | Name of vessel | Incorporation dates | Vessel operation starting dates | Shipbuilding contract dates |
|---|---|---|---|---|
| Barbaros Maritime Ltd. | M/T Power | Oct 22, 2002 | Sep 23, 2011 | Dec 6, 2006 |
| Blue Shipping Ltd. | M/T Blue | Jan 27, 2006 | Feb 11, 2010 | Nov 17, 2006 |
| Pink Shipping Ltd. | M/T Pink | Jan 27, 2006 | Jun 23, 2010 | Nov 17, 2006 |

| Profit Shipping Ltd. | M/T Profit | Aug 18, 2006 | Aug 19, 2009 | Aug 25, 2006 |
|---|---|---|---|---|
| True Shipping Ltd. | M/T True | Oct 13, 2006 | Jun 4, 2010 | Oct 16, 2006 |
| Target Shipping Ltd. | M/T Target | Oct 13, 2006 | Nov 23, 2009 | Oct 16, 2006 |
| Blank Shipping Ltd. | M/T Blank | Jun 26, 2007 | Jan 26, 2011 | Nov 15, 2009 |
| Reef Shipping Ltd. | M/T Reef | Jun 26, 2007 | Jul 26, 2010 | Dec 6, 2006 |
| Value Shipping Ltd. | M/T Value | Jul 18, 2007 | Jul 15, 2011 | Dec 6, 2006 |
| Bravo Shipping Ltd. | M/T Bravo | Jul 18, 2007 | Jul 13, 2011 | Dec 6, 2006 |

Universal Maritime Inc. – Prospectus

## 10      BUSINESS OVERVIEW

The Company has entered into the Acquisition Agreement, pursuant to which it will acquire all the shares in the ten Predecessor Companies which currently own and operate the Initial Fleet consisting of five Aframax and five Suezmax tankers described below in Section 10.3 "—Fleet Overview". For further description of the Acquisition Agreement, and the purchase price for the shares in the ten Predecessor Companies, see Section 5 "The acquisition of the Initial Fleet".

The Initial Fleet of ten vessels are all employed on long-term time charter contracts providing for 100% commercial utilization for a minimum period of three to five years. See Section 10.4 "—Contract coverage overview" for further information on the timecharters.

### 10.1      Business strategy and opportunities

#### 10.1.1      Business strategy

Universal's strategy is to assemble a fleet of modern crude tankers. The Initial Fleet will consist of Aframax and Suezmax tankers which will be employed in a manner that Management believes provide downside protection while preserving upside potential. Universal plans to expand its relationship with Shell, as described below, and pursue growth through adding additional vessels to its existing fleet. To facilitate Universal's growth strategy in the short term, Geden has agreed to grant the Company a fixed rate purchase option on two Suezmax vessels (the "**Option Agreement**"). The purchase price for the two vessels are, pursuant to the Option Agreement, set to be $56 million for the 2011 built Hero and $58 million for the 2012 built Prima (not delivered from the yard yet). This fixed price option is valid for 12 months after Listing. The Option Agreement is described further in Section 15.2 "Related party transactions—Option Agreement".

Universal will also seek to expand its fleet through acquisitions of secondhand tonnage, if and when this is determined appropriate. Universal may elect to place additional vessels on similar structured time charters, in the spot market or on fixed-rate time charters, depending on what is considered most profitable given the markets at that time.

Universal's growth strategy relies on balancing what Management believes is the most attractive vessel employment profile, combined with a sound capital structure. Management believes that by relying on a combination of equity and debt financing for future vessel acquisitions, Universal will be in a better position to withstand the volatility of the spot market and will have more cash available to support future growth and pay dividends in the future, than if Universal relied primarily on debt financing.

Key elements of the business strategy include:

***Deploying the fleet on long-term spot market index-related time charters with reputable and creditworthy counterparties***

Universal's unique fleet employment profile with creditworthy counterparties will provide shareholders with the opportunity to invest in a company that delivers returns based on the tanker spot market index as well as protecting investors against volatile markets. Eight of Universal's vessels are on time charters to Shell. Shell, together with its affiliates, is a major international charterer with a strong reputation as a creditworthy counterparty.

Two of Universal's other Suezmax tankers are on time charters to ST Shipping.

Upon the expiration of the charters with ST Shipping, Universal may choose to deploy these vessels in the spot or time charter markets, with either Shell or other reputable and creditworthy counterparties.

***Strategically expanding the fleet size***

Universal intends to acquire modern, high-specification crude tankers through selective and timely acquisitions in a manner that is accretive to earnings and cash flow. In accordance with the Option Agreement, the Company has the option to acquire two additional Suezmax tankers from Geden. This option can be declared for one or both of the vessels within the first 12 months of being listed. In addition, the Company has entered into an agreement regarding right of first refusal with Geden on all time charters over 12 months and contracts of affreightment in the crude tanker sector as well as all sale and purchase opportunities in the crude sector ("**Agreement on Right of First Refusal**"). This agreement will provide the Company the right to purchase any crude tanker from Geden as well as timecharters and contracts of affreightment. Universal's Initial Fleet will be comprised of Aframax and Suezmax tankers, which due to their size and draft (depth below the water line) have significantly more trade-lane options than VLCCs. Management believes these vessels will exhibit relatively lower spot market volatility due to shorter ballast (non-revenue cargo) voyages, however Universal, will evaluate all classes of tankers in the future. A key element to Universal's acquisition strategy will be to pursue vessels at attractive prices and Universal believes that current tanker values present attractive opportunities to grow the fleet. Given Universal's strong relationship with Geden and Shell, as well as its existing connections to third parties, there will be numerous opportunities to acquire and employ vessels in the future.

***Maintaining conservative leverage levels***

Universal believes that the use of a combination of equity and debt to finance new vessel acquisitions will strengthen the balance sheet. The intention is to maintain a conservative debt level to permit additional vessel purchases. Universal expects to finance borrowings through future equity and/or debt issuances. Universal expects to finance borrowings through future equity and/or debt issuances. Universal believes that managing Universal's monthly expenditures by keeping a moderate debt level will improve its ability to better withstand any market volatility, while also maintaining the ability to earn attractive risk-adjusted returns during improving spot market conditions. This flexibility combined with the protection of the Shell charters base rate floors for the next 24 months and the high rate premium ST Shipping charters offer downside protection and while preserving upside opportunity.

***Maintaining a low overhead structure by outsourcing key functions to experienced vessel managers***

Universal intends to outsource technical management functions of the Initial Fleet to GDAS, thereby leveraging the global service platforms and long tenured expertise of the entity. Universal believes that GDAS will be able to manage the vessels at a cost that would be lower than what could be achieved by performing these functions in-house and that the rates of GDAS is competitive with those that would be available through third-party managers. Universal believes that vessel management is a business that benefits from a worldwide presence, well-developed infrastructure and a broad network of strong customer relationships.

***Providing a high level of customer service by maintaining high reliability, safety, environmental and quality standards***

Major oil companies are looking for reliable partners who can deliver, are reputable and can provide both quality and safety. Universal intends to deliver a high level of customer service by: demonstrating responsiveness, reliability, professionalism and integrity; adopting responsible environmental practices and adhering strictly to environmental regulations; demonstrating a dedication to safe operations; and using customer feedback and industry and internal performance measures to drive continuous improvements.

10.1.2    *Chartering strategy*

The eight vessels in the Initial Fleet chartered to Shell are on a base rate for a period up until May 31, 2014 plus a 50/50 profit share calculated on a monthly basis for the difference between spot-indexed rates achieved above the base rate for the trade routes described in Section 10.4 "—Contract coverage overview". At the option of Universal before May 31, 2014 or automatically after that date, the rate for the charters will be based on a spot-indexed rate formula for the relevant trade routes. The two remaining vessels in the Initial Fleet are on charter to

ST Shipping with base rates of $37,300 (M/T Pink) and $37,550 (M/T Reef), respectively for the entire period of the charter less a 1.25% broker's commission. If a basket of spot market rates is above the base rates, there will be a 50/50 profit share for the difference between the rates achieved above the base rate indicated and the base rate. Hence, the charters for all vessels in the Initial Fleet provide both downside protection until May 31, 2014 and preserve upside potential for the entire duration of the charters. As further described in Section 10.7.2 "—Litigation and disputes—Pink Shipping Ltd. versus ST Shipping", the time charter for M/T Pink is subject to dispute. As such, the earnings of M/T Pink under the original charter party have been guaranteed by Geden as part of the Acquisition Agreement.

Any vessels acquired in the future may be employed under a combination of various charter structures on spot market index-related, on base rate plus profit share, on fixed rate, pure spot, as well as in tanker pools. Universal intends to expand its relationship with Shell and will also look to employ its vessels in the best manner possible to achieve maximum returns for investors without compromising protection. Spot market revenues may generate increased profit margins during times of escalating rates, while fixed-rate time charter revenues tend to provide more stable cash flows. Universal's charter portfolio provides a blend of both these elements while still delivering 100% commercial utilization. Universal will seek to deploy the vessels in a manner that maximizes cash flow while balancing the need to account for potential changes to the freight rate market and global economic conditions.

*10.1.3      Operations*

There are two key components to the operation of the fleet:

- − commercial and strategic management; and
- − technical management.

### Commercial and strategic management

The Company will carry out the commercial and strategic management of the fleet and perform certain administrative functions through the Company's wholly-owned subsidiary, UM (USA) LLC, a Delaware limited liability company that was formed in March 2011 and maintains its principal executive offices in New York, New York. Universal has entered into a Service Agreement with GDAS for various management services such as supervising, expediting and procuring insurance as well as processing any various types of claims.

Commercial management includes, among other things, negotiating charters, monitoring vessel performance, managing chartering relationships and supervising the technical management. In this regard, the Initial Fleet has been employed under charters that provide 100% commercial utilization of all vessels up until March 31, 2015.

### Technical management

Technical management of the Initial Fleet will be provided by GDAS. Technical management includes managing day-to-day vessel operations, performing general vessel maintenance, ensuring regulatory and classification society compliance, supervising the maintenance and general efficiency of vessels, arranging the hire of qualified officers and crew, arranging and supervising drydocking and repairs, arranging for the purchase of supplies, spare parts and new equipment for vessels, appointing supervisors and technical consultants and providing technical support. The technical manager will provide these services pursuant to industry-standard form management agreements, which are described under Section 15.4 "Related party transactions—Technical management agreements". Universal will review the performance of the technical managers on a periodic basis.

Universal believes that GDAS is a leader in providing independent ship management and related services and that having GDAS as a vessel manager will increase efficiency, operational excellence and cost control. GDAS currently provides technical management services for Geden's fleet, which currently consists of 44 tankers and drybulk carriers, including newbuilds and the Initial Fleet. GDAS maintains a staff of approximately 1,000 off-shore crew members and 120 shore-based personnel. In addition, GDAS will also manage and process all crew insurance claims.

Universal Maritime Inc. – Prospectus

The technical management agreements have durations equal to the duration of the current charter parties entered into by the Predecessor Companies. The Predecessor Companies may terminate the management agreement with GDAS if GDAS defaults on any obligation to the Predecessor Companies, and such default is not remedied within a reasonable period of time or in a reasonable manner.

GDAS will maintain records of all costs and expenditures incurred in connection with its services that will be available for the Predecessor Companies review on a daily basis. As the technical manager, GDAS will receive fees for the services it provides at rates that Universal believes are comparable to other third-party management rates. Further, the Predecessor Companies shall reimburse the technical manager for its costs and expenses incurred in providing certain of the services.

## 10.2      Competitive strengths and position

Universal believes that it possesses a number of competitive strengths that will allow them to capitalize on growth opportunities in the crude oil tanker market, including the following strengths:

### 10.2.1   Modern, high-specification fleet of tankers

Universal's Initial Fleet will have high specifications, satisfying the highest levels of regulatory and classification society compliance. The Initial Fleet will have an average age profile of approximately 1.8 years as of the date of the Prospectus. Universal's vessel acquisition strategy will target modern double-hull tankers built in recognized shipyards. Management believes that owning a modern, high-specification fleet of double-hull tankers reduces operating costs and fuel consumption and will allow the fleet to be more reliable and attractive to charterers and oil majors. The fleet's five Suezmax and five Aframax tankers are sister ships built under the supervision of GDAS. The operation of sister ships can result in cost efficiencies by maintaining fewer spare parts, because various parts are inter-changeable between sister ships. Where applicable, Universal will seek to acquire sister ships in the future. The tanker shipping industry is highly regulated and Universal aims to own and operate high-specification vessels that satisfy all current and pending safety and environmental regulations. Universal believes that with the high specifications and young age, the vessels in the Initial Fleet will be acceptable to all of the oil majors and other major charterers and thereby provide Universal with a competitive advantage in securing favorable employment for the vessels.

### 10.2.2   High utilization of Universal's fleet on spot market index-related time charters

Pursuant to the terms of the Master Umbrella Agreement, as further described in Section 10.5.1 "—Material agreements—Master Umbrella Agreement", Universal will operate eight of the vessels that will comprise the Initial Fleet on three- and five-year time charters with Shell or its affiliates. In addition Universal has two Suezmax vessels on three year timecharters to ST Shipping. Universal believes that the unique combination of time charters will provide the benefit of 100% commercial utilization, exclusive of drydocking and unscheduled off-hire days. In addition, Management believes that these time charters will provide the benefit of creditworthy charter counterparties for the duration of the vessel charters as well as any exercised optional renewal periods. The timecharters will allow Universal to operate with considerably less working capital than vessels operating solely on a spot market basis or in a pool because under the timecharters with Shell or its affiliates will be paid monthly in advance and the payment of bunker fuel costs and port disbursements will be the responsibility of the charterer as well as all other risks associated with operating in the spot market, such as the risk of weather, delay and demand. Management believes that the combination of charters with spot market exposure and base rate charters will enable Universal to take advantage of prevailing market conditions while enjoying the stability associated with time charter employment.

### 10.2.3   Significant growth opportunities through Universal's relationship with Geden

Universal has entered into the Option Agreement with Geden for the purchase of two Suezmaxes. The purchase price for the two vessels are agreed to be $56 million and $58 million. The option is valid for 12 months following the completion on the Offering. In addition, Universal has entered into the Agreement on Right of First Refusal with Geden on all time charters over 12 months and contracts of affreightment in the crude tanker sector as well as all sale and purchase opportunities in the crude sector.

*10.2.4   Technical management expertise and experience of GDAS*

GDAS provides technical management services for all of Geden's tankers and drybulk carriers. Universal intends to benefit from the relationships that GDAS has developed over decades with classification societies and ship and repair yards. GDAS has developed operating processes, vessel maintenance monitoring programs and information systems from which Universal can also benefit from. GDAS also has a strong reputation within the shipping industry for providing high-quality vessel technical management services.

*10.2.5   Conservative debt level resulting in a strong balance sheet*

Following the Offering, Universal expects to have a moderate loan-to-value debt facility in place. Universal may finance future vessel acquisitions on an interim basis with a combination of equity and debt financing. Universal intends to maintain a conservative level of debt by making purchases at times when equity offerings will be available at attractive terms, allowing Universal to refinance borrowings with future equity issuances. Having borrowing capacity under the New Debt Facility and a strong balance sheet with a conservative debt level will enable Universal to move quickly in acquiring vessels as opportunities arise and support the ability to pay dividends in the future.

*10.2.6   Experienced corporate management*

The management team has an average of 20 years' experience in the international shipping industry, including the tanker sector as well as in public companies. As a result, Universal believes that the management team has built strong relationships with major international charterers, third-party suppliers, shipbuilders and financial institutions, and developed extensive operational capabilities and strong vessel acquisition capabilities. Please see Section 11.2 "Board, Management and Employees—Management" for further biographical information.

## 10.3      Fleet overview

Universal's Initial Fleet is composed of 5 modern Suezmax crude tankers and 5 modern Aframax crude tankers totalling 4.8 million deadweight tons with an average age of 1.8 years as of the date of this Prospectus.

*10.3.1   Suezmax fleet*

**"M/T Profit"**



| | |
|---|---|
| Name | M/T Profit |
| Built | August 2009 |
| Place of registration | Malta |
| Capacity | 156,000 |
| Yard | Rongsheng |
| Ship owning company | Profit Shipping Ltd. |
| Commercial manager | UM (USA) LLC |
| Technical manager | GDAS |

**"M/T Blue"**



| | |
|---|---|
| Name | M/T Blue |
| Built | February 2010 |
| Place of registration | Malta |
| Capacity | 156,000 |
| Yard | Rongsheng |
| Ship owning company | Blue Shipping Ltd. |
| Commercial manager | UM (USA) LLC |
| Technical manager | GDAS |

**"M/T Pink"**



| | |
|---|---|
| Name | M/T Pink |
| Built | June 2010 |
| Place of registration | Malta |
| Capacity | 156,000 |
| Yard | Rongsheng |
| Ship owning company | Pink Shipping Ltd. |
| Commercial manager | UM (USA) LLC |
| Technical manager | GDAS |

**"M/T Reef"**



| | |
|---|---|
| Name | M/T Reef |
| Built | July 2010 |
| Place of registration | Malta |
| Capacity | 156,000 |
| Yard | Rongsheng |
| Ship owning company | Reef Shipping Ltd. |
| Commercial manager | UM (USA) LLC |
| Technical manager | GDAS |

**"M/T Blank"**



| | |
|---|---|
| Name | M/T Blank |
| Built | January 2011 |
| Place of registration | Malta |
| Capacity | 156,000 |
| Yard | Rongsheng |
| Ship owning company | Blank Shipping Ltd. |
| Commercial manager | UM (USA) LLC |
| Technical manager | GDAS |

*10.3.2    Aframax fleet*

**"M/T Target"**



| | |
|---|---|
| Name | M/T Target |
| Built | November 2009 |
| Place of registration | Malta |
| Capacity | 115,000 |
| Yard | Samsung |
| Ship owning company | Target Shipping Ltd. |
| Commercial manager | UM (USA) LLC |
| Technical manager | GDAS |

**"M/T True"**



| | |
|---|---|
| Name | M/T True |
| Built | June 2010 |
| Place of registration | Malta |
| Capacity | 115,000 |
| Yard | Samsung |
| Ship owning company | True Shipping Ltd. |
| Commercial manager | UM (USA) LLC |
| Technical manager | GDAS |

**"M/T Bravo"**



Name.................................................... M/T Bravo
Built ..................................................... July 2011
Place of registration .............................. Malta
Capacity................................................. 115,000
Yard...................................................... Samsung
Ship owning company............................ Bravo Shipping Ltd.
Commercial manager............................. UM (USA) LLC
Technical manager ................................ GDAS

**"M/T Value"**



Name.................................................... M/T Value
Built ..................................................... July 2011
Place of registration .............................. Malta
Capacity................................................. 115,000
Yard...................................................... Samsung
Ship owning company............................ Value Shipping Ltd.
Commercial manager............................. UM (USA) LLC
Technical manager ................................ GDAS

**"M/T Power"**



Name.................................................... M/T Power
Built ..................................................... September 2011
Place of registration .............................. Malta
Capacity................................................. 115,000
Yard...................................................... Samsung
Ship owning company............................ Barbaros Maritime Ltd.
Commercial manager............................. UM (USA) LLC
Technical manager ................................ GDAS

*10.3.3    Fixed price option vessels*

**"M/T Hero"**



Name.................................................... M/T Hero
Built ..................................................... June 2011
Place of registration .............................. Malta
Capacity................................................. 156,000
Yard...................................................... Rongsheng
Purchase option.................................... $56 million
Expiry of option ..................................... 12 months post Offering

**"M/T Prima"**



Name.................................................... M/T Prima
Built ..................................................... July 2012 (scheduled)
Place of registration .............................. Malta
Capacity................................................. 156,000
Yard...................................................... Rongsheng
Purchase option.................................... $58 million
Expiry of option ..................................... 12 months post Offering

*10.3.4    Valuation of the Initial Fleet*

The table below lists the valuations of the Initial Fleet on the basis of prompt charter free delivery, as between a willing seller and a willing buyer for cash payment under normal commercial terms according to the Clarkson Valuations Limited valuation as attached as Appendix F to the Prospectus.

Universal Maritime Inc. – Prospectus

| Name of vessel | Charter free values as at May 21, 2012 (in $ millions) |
|---|---|
| M/T Power | $44.5 |
| M/T Blue | $53.25 |
| M/T Pink | $53.25 |
| M/T Profit | $50.25 |
| M/T True | $41.75 |
| M/T Target | $39.0 |
| M/T Blank | $56.0 |
| M/T Reef | $53.25 |
| M/T Value | $44.5 |
| M/T Bravo | $44.5 |

The charter free values were prepared by Clarkson Valuations Limited and are based on recent transactions, negotiations and broker's market knowledge. The valuation relates to May 21, 2012 and is not a guide to the market value of the vessels at any other time.  The vessels have been valued individually and if the ships were to be placed on the market at the same time, no assurance may be given that the amount realisable would be equal to the total of the individual values. Market values in the shipping industry are volatile. The vessels have not been inspected by Clarkson Valuations Limited.

**10.4      Contract coverage overview**

The Initial Fleet of ten vessels are all employed on long-term time charter contracts providing for 100% commercial utilization for a minimum period of three to five years. The charter agreements will provide for payment of charterhire to Universal 365 days per year, with the exception of off-hire days.  All ten vessels have been approved, vetted and commenced the time charters with their respective charterers.

Universal's fleet consists of:

| Vessel Name | Vessel Type* | Dwt | Delivery from Shipyard | Shipyard | Initial Charterer and Charter Duration | Shell's Optional Charter Renewal Period | Base Rate or Benchmark Index |
|---|---|---|---|---|---|---|---|
| M/T Profit | Suezmax | 156,000 | August 2009 | Rongsheng-China | Shell -Three Years from June 1 2012 | Three Years | $13,500/TD5 ** |
| M/T Blue | Suezmax | 156,000 | February 2010 | Rongsheng-China | Shell - Three Years from June 1 2012 | Three Years | $13,500/TD5 ** |
| M/T Blank | Suezmax | 156,000 | January 2011 | Rongsheng-China | Shell -Three Years from June 1 2012 | Three Years | $13,500/TD5 ** |
| M/T Target | Aframax | 115,000 | November 2009 | Samsung-Korea | Shell - Five Years from June 1 2012 | Five Years | $11,500/TD9 ** |
| M/T True | Aframax | 115,000 | June 2010 | Samsung-Korea | Shell - Five Years from June 1 2012 | Five Years | $11,500/TD7 ** |
| M/T Value | Aframax | 115,000 | July 2011 | Samsung-Korea | Shell - Five Years from June 1 2012 | Five Years | $11,500/TD7 ** |
| M/T Bravo | Aframax | 115,000 | July 2011 | Samsung-Korea | Shell -Five Years from June 1l 2012 | Five Years | $11,500/TD7 ** |
| M/T Power | Aframax | 115,000 | September 2011 | Samsung-Korea | Shell - Five Years from June 1 2012 | Five Years | $11,500/TD9 ** |

| M/T Pink**** | Suezmax | 156,000 | June 2010 | Rongsheng-China | ST Shipping - Five Years from 24 June 2010 | N/A | $37,300 *** |
| M/T Reef | Suezmax | 156,000 | July 2010 | Rongsheng-China | ST Shipping - Five Years from 27 July 2010 | N/A | $37,550 *** |

* Each vessel is a sister ship of each other vessel of the same type.
** The eight vessels in the Initial Fleet chartered to Shell are on a base rate indicated in the table for a period of up to two years as of 1 June 2012 plus a 50/50 profit share calculated on a monthly basis for the difference between spot-indexed rates achieved above the base rate for the trade routes indicated. At the option of Universal before the two years or automatically after the two years, the rate for the charter will be based solely on a spot-indexed rate formula for the trade routes indicated. The formula for rates are based on the monthly average of the daily charter rates for crude oil-carrying tankers published by The Baltic Exchange Limited (the "Baltic Exchange"), a 250-year old shipping institution located in London, England. The daily rates that the Baltic Exchange publishes are known as freight assessments. The freight assessments represent the cost of shipping crude oil and oil products by sea on each of the 24 Baltic International Tanker Routes ("BITRs"), including the TD5, TD7 and TD9 routes on which the charter rates that Shell will pay are based. TD7 reflects a spot voyage for 80,000 metric tons of crude oil from the North Sea to continental Europe. TD 9 reflects a spot voyage for 70,000 metric tons of crude oil from the Caribbean to the U.S. Gulf. which reflects a spot voyage for 130,000 metric tons of crude oil from West Africa to the United States Atlantic coast.
*** The two Suezmax vessels on charter to ST Shipping have base rates as indicated for the entire period of the charter less a 1.25% broker's commission. If a basket of spot market rates is above the base rate, then there will be a 50/50 profit share for the difference between the rates achieved above the base rate indicated and the base rate with a 1.25% address commission for such difference. The basket of spot rates based on Clarkson's Suezmax earnings averaged on four trade routes weighed as follows 21% Cross Mediterranean Sea, 27% West African-Mediterranean, 27% West Africa-U.S. Atlantic Cost, and 25% Arabian Gulf/South China
**** The stated rate for the M/T Pink are being guaranteed by Geden, cf. Section 10.7.2 "—Litigation and disputes—Pink Shipping Ltd. versus ST Shipping.

## 10.5    Material Agreements

### 10.5.1    Master Umbrella Agreement

The Company has entered into a Master Umbrella Agreement with Shell on May 11, 2012. The Master Umbrella Agreement relates to, among other things, the charter agreements currently in place between Shell and eight of the SPV's to be acquired by the Company pursuant to the Acquisition Agreement upon completion of the Offering. The said charter agreements were entered into March 13, 2012 and relate to five Aframax tankers and three Suezmax tankers owned by the following subsidiaries: True Shipping Ltd., Blue Shipping Ltd., Profit Shipping Ltd. Barbaros Maritime Limited., Value Shipping Ltd., Blank Shipping Ltd., Bravo Shipping Ltd. and Target Shipping Ltd.. According to the charter agreements the period of time charter for Suezmax tankers is 36 months and for Aframax tankers 60 months. The vessels in the Initial Fleet were delivered under these charters in the period from March 26, 2012 to May 8, 2012.

The Master Umbrella Agreement shall become effective upon the completion of the Acquisition Agreement as described in Section 5.2 "The acquisition of the Initial Fleet—The Acquisition Agreement", the listing of the Company's shares on the Oslo Stock Exchange, or alternatively Oslo Axess, and the Company having executed the warrant instrument described below. When the Master Umbrella Agreement becomes effective, Geden and Shell shall terminate their current master umbrella agreement regarding the same eight vessels.

The Master Umbrella Agreement requires that the Company, directly or indirectly, charters to Shell or its affiliates, and that Shell or its affiliates charters from Universal, five Aframax vessels and three Suezmax vessels which all may not exceed 15 years in age. The charters shall have a duration of five and three years, respectively, as of the commencement date of the charters as set forth above, and Shell has a renewal option for each of these charters for an additional five or three years, respectively. Should the number of tankers that the Company make available to Shell or its affiliates fall below five and/or the age of one or more of the vessels in the fleet under the charter agreements rise above 15 years, then Shell or its affiliates may require the Company, within a reasonable time, to substitute and charter to Shell or its affiliates further vessels to maintain the minimum number or age requirements. If the Company should not substitute an appropriate tanker, then Shell or its affiliates will further have the option to charter other vessels themselves or to terminate the Master Umbrella Agreement, and thus indirectly all charters governed thereunder, on three months' written notice.

Pursuant to the Master Umbrella Agreement, the Company shall issue non-forteiable, fully-vested warrants to Shell, giving Shell the right to purchase such number of shares in the Company as is equal to 7% of the Offer Shares, including any Shares issued pursuant to the Over-Allotment Option, at an exercise price equal to the Offer Price. The warrants become exercisable upon the charter renewal period, i.e. three-eighths of these warrants become exercisable April 2015 and five-eighths become exercisable April 2017. The warrants will have an exercise period of five business days (if not exercised within this period, they expire worthless), and will include customary anti-dilution provisions. These warrants will not have voting or dividend rights. For further

discussion of these warrants, please see Section 13.12 "Operational and financial review—Application of critical accounting principles, estimates and judgments". The effectiveness of the warrants is conditional on the closing of the Offering and the listing of the Shares.

The Master Umbrella Agreement further provides that: (i) the Initial Fleet chartered by Shell shall be managed by GDAS (ii) in the event that GDAS ceases to manage any of the vessels, Shell International Trading and Shipping Company or another technical manager approved by Shell shall manage the vessels; (iii) all vessels shall be flagged in either Malta, the Marshall Islands or the Isle of Man; and (iv) the Company will, when the Master Umbrella Agreement becomes effective, discuss with Shell an option to employ three further Aframax or Suezmax tankers with Shell or its affiliates on time charters with similar terms to the terms of the current time charters.

Once in effect the Master Umbrella Agreement shall continue in force until the later of (i) the fifth anniversary of the effective date of the agreement or (ii) the expiry of the last charter agreement to expire (including charter parties extended by Shell under the agreement. However, the Master Umbrella Agreement and all time charters governed by it may terminate at an earlier point in time if a termination event, being including but not limited a material breach of either party, an insolvency event in relation to either party or Geden (for as long as Geden holds at least 20% of all Shares in the Company), change of control in relation to the Company (following the completion of the Offering) or Shell and force majeure or material adverse changes as defined in the Master Umbrella Agreement.

The Company is dependent upon the Master Umbrella Agreement as the majority of the Initial Fleet is chartered out based on this agreement.

### 10.5.2   Other material agreements

Universal has is in addition entered into a number of other commercial contracts of importance to its business such as the time charter contracts entered into with ST Shipping described in Section 10.4 "—Contract coverage overview", the Option Agreement described in Section 15.2 "Related party transactions—Option Agreement", the Agreement on Right of First Refusal described in Section 15.3 "Related party transactions—Agreement on Right of First Refusal", the technical management agreements described in Section 15.4 "Related party transactions—Technical management agreements" and the New Debt Facility described in Section 13.11.2 "Operational and financial review—Capital resources—The New Debt Facility".

## 10.6      Health, environment, safety and quality policy

Universal's policy is to operate its business in a manner designed to protect the health and safety of its employees, its customers, the public, and the environment, and in accordance with all applicable safety, environmental and safety laws and regulations so as to ensure the protection of the environment and Universal's personnel and property. All employees should conduct themselves in a manner that is consistent with this policy. Any departure or suspected departure from this policy must be reported promptly.

Universal shall be a professional and positive workplace with an inclusive working environment.

All Universal's employees shall help to create a work environment free from any discrimination, due to religion, skin color, gender, sexual orientation, age, nationality, race and disability.

## 10.7      Litigation and disputes

From time to time, Universal expects to be involved in litigation, disputes and other legal proceedings arising in the normal course of business. Neither the Company, UM (USA) LLC nor any of the Predecessor Companies are, nor have been during the course of the preceding 12 months been involved in any legal, governmental or arbitrational proceedings which may have, or have had in the recent past significant effects on the Company's or Universal's financial position or profitability except the three legal proceedings listed below:

### 10.7.1   BP Oil International versus Target Shipping Ltd.

In December 2011 and January 2012 a trial took place in the English courts between BP Oil International ("**BP Oil**") and one of the Predecessor Companies, Target Shipping Ltd. ("**Target**"). The subject matter of the trial was

Universal Maritime Inc. – Prospectus

that BP Oil claimed repayment of overpaid freight under a voyage charter party from Target. BP Oil argued that Target had rendered an incorrect invoice and that BP Oil had paid the invoice by mistake. The allegedly overpaid freight was in the amount of $1,015,353. On June 16 2012, the judgment was handed down without any conclusive result. Pursuant to the judgment, BP Oil were not awarded any money, but the judgment left open the opportunity of BP Oil making a recovery of an amount which is yet to be determined. The judgment concludes that there should be an enquiry into the amount, if any, that BP Oil shall recover. Target may choose to appeal the judgment before such enquiry is held. In any event, a conclusive determination from the court is not expected until the autumn of 2012 and such determination may be appealed.

The Acquisition Agreement contains a provision pursuant to which Geden shall receive compensation from the Company equal to such amount as may be received by Target pursuant to a judgment or, if appealed, by any other court.

If the judgment is in favor of BP Oil, the Acquisition Agreement includes a provision according to which Geden undertakes to carry all costs associated with the Target dispute going forward and indemnify Target for any liability arising from this dispute or the facts on which it is based.

### 10.7.2   Pink Shipping Ltd. versus ST Shipping

There is an ongoing dispute between ST Shipping and one of the Predecessor Companies, Pink Shipping Ltd., over the rate payable by ST Shipping under a charter party over the vessel M/T Pink (the "**Pink Charter**").

The charter party signed by the parties was to take effect from June 24, 2010, when the construction of M/T Pink was to be completed. ST Shipping refused to take delivery, alleging that the M/T Pink as delivered was not the vessel they had contracted for. Pink Shipping Ltd. commenced arbitration against ST Shipping, claiming that ST Shipping was in breach of the charter party. Then the parties agreed that ST Shipping could take Pink on a mitigation charter at a rate of $29,000 per day on the basis that if they lost the arbitration ST Shipping would pay to Pink Shipping Ltd. the accrued difference between $37,300 per day (the "**Original Charter Rate**") and $29,000 per day (the "**Mitigation Rate**"). ST Shipping currently pays the difference between the Original Rate and the Mitigation Rate into an escrow account.

This dispute has been subject to arbitration in which Pink Shipping Ltd. arguments prevailed. The arbitrators' decision has however been appealed by ST Shipping.

Per the Acquisition Agreement, Geden guarantees that Pink Shipping Ltd receives the Original Charter Rate throughout the term of the Pink Charter. Further, Geden shall be responsible for the conducting of any appeals proceedings relevant to the arbitration award, and shall cover all costs thereof, always keeping the Company reasonably updated on the developments.

### 10.7.3   Blue Shipping Ltd. versus ST Shipping

One of the Predecessor Companies, Blue Shipping Ltd. ("**Blue**") is party to a dispute with ST Shipping relevant to the vessel M/T Blue.

This dispute has been subject to arbitration in which Blue was awarded damages based on the unjustified cancelation by ST Shipping of the time charter relevant to M/T Blue. The award has however been appealed by ST Shipping.

Geden and the Company have agreed in the Acquisition Agreement that Geden shall receive compensation from the Company equal to such amount as may be received by Blue pursuant to the final decision in the Blue Dispute. Further, per the Acquisition Agreement, Geden undertakes to be responsible for all costs associated with this dispute going forward and to indemnify Blue for any liability arising from the dispute or the facts and circumstances on which it is based.

Blue is currently one of the vessels being chartered to Shell.

**11      BOARD, MANAGEMENT AND EMPLOYEES**

**11.1      The Board**

*11.1.1    Overview of the Board*

The Board Members are elected by a plurality of the votes cast by shareholders entitled to vote. The Bylaws require the Board to consist of at least one member. As of the date of this Prospectus, the Board consists of three members. The Bylaws may be amended by the vote of a majority of the entire Board or by the vote of at least two-thirds of the votes cast at an annual meeting of shareholders.

The Board is elected annually on a staggered basis, and each director elected will hold office for a three-year term or until his successor shall have been duly elected and qualified, except in the event of his death, resignation, removal or the earlier termination of his term of office. The initial term of office of each director is as follows: two will serve for a term expiring at the 2013 annual meeting of shareholders, two will serve for a term expiring at the 2014 annual meeting of shareholders and two will serve for a term expiring at the 2015 annual meeting of the shareholders.

As of the date of this Prospectus the Board is composed of three members. From the first day of listing, three new and independent board members, James Drakos, Claus Plougmand and Jens Ismar, will take office in addition to the existing board members.

The names and positions of the current Board Members are set out in the table below.

| Name | Position | Served since | Term expires |
|------|----------|--------------|--------------|
| M. Bülent Ergin | Chairman | March 2011 | 2015 |
| A. Tuğrul Tokgöz | Vice Chairman | March 2011 | 2014 |
| Mehmet Mat | Director | March 2011 | 2013 |

The names and positions of the Board Members as of listing are set out in the table below:

| Name | Position | Served since | Term expires |
|------|----------|--------------|--------------|
| M. Bülent Ergin | Chairman | March 2011 | 2015 |
| A. Tuğrul Tokgöz | Vice Chairman | March 2011 | 2014 |
| Mehmet Mat | Director | March 2011 | 2013 |
| Jens Ismar | Director | First day of listing | 2013 |
| James A. Drakos | Director | First day of listing | 2014 |
| Claus Plougmand | Director | First day of listing | 2015 |

The composition of the Board as of listing will be in compliance with the independence requirements of Oslo Stock Exchange (or alternatively Oslo Axess) listing requirements. The composition of the Board as of listing will not be in compliance with the independence requirements of the Norwegian Code of Practice for Corporate Governance of October 21, 2010 as amended (the "**Corporate Governance Code**") as only three out of six Board Members are independent from the Company's material business contacts.

Of the current Board, Mr Ergin holds the position as the chairman of the board of directors of Geden and GDAS. Mr. Tokgöz is a board member and the chief executive officer of Geden and GDAS and Mr. Mat is the chief financial officer of Geden and GDAS. GDAS is an affiliate of Geden. Thus, by holding these positions Messrs. Ergin, Tokgöz and Mat will not be independent of GDAS, which, through the technical management agreements and the services agreement (as further described in Section 15 "Related party transactions"), is a material business contact. The requirement of the Code that at least two of the Board Members shall be independent of the Company's larger shareholders is fulfilled as Mr Ismar, Mr Drakos and Mr Plougmand are independent of Geden. All of the Board Members are independent from the Company's executive management, so the requirement of the Code that a majority of the Board Members shall be independent from the Company's executive management is fulfilled.

Universal Maritime Inc. – Prospectus

The business address for each director is the address of the Company's principal executive office which is c/o UM (USA) LLC, 545 Madison Avenue, New York, NY 10022.

*11.1.2      Brief biographies of the members of the Board*

Set out below are brief biographies of the Board Members, including their relevant management expertise and experience, an indication of any significant principal activities performed by them outside the Company and names of companies and partnerships of which a Board Member is or has been a member of the administrative, management or supervisory bodies or partner the previous five years (not including directorships and executive management positions in subsidiaries of the Company).

**M. Bülent Ergin, Chairman**

M. Bülent Ergin has served as the Chairman of the Board since its incorporation in March 2011. Mr. Ergin has extensive experience in the shipping industry, having served as the chairman of the board of directors of GDAS since 1993 and Geden since 2002. Mr. Ergin graduated from the Department of Constructional Engineering of Robert College in Istanbul, Turkey.

**A. Tuğrul Tokgöz, Vice Chairman**

Mr. Tokgöz has served as the Vice-Chairman of the Board since its incorporation in March 2011. Mr. Tokgöz has been involved in the shipping industry for over 17 years, and since 1997, he has been the chief executive officer and director of GDAS since 1997 and in Geden since 2002. Mr. Tokgöz graduated from the Faculty of Business Administration of Bilkent University in Ankara, Turkey

**Mehmet Mat, Director**

Mr. Mat has served as a member of the Board since March 2011. Mr. Mat has more than 12 years of experience in the shipping industry. Mr. Mat has served as the chief financial officer of GDAS since 2000 and Geden since 2002. Before joining GDAS, he worked for commercial banks in Turkey acting as relationship manager for corporate clients. Mr. Mat currently also heads the finance function at certain other Çukurova Group companies. Mr. Mat holds a bachelor's degree in economics from the Faculty of Political Science at the University of Ankara in Turkey and a master's of business administration degree from the University of Dallas.

**James A. Drakos, Director**

Mr. Drakos has agreed to serve as a member of the Board upon the completion of the Offering. Mr. Drakos has served as the chief executive officer and president of Groton Pacific Carriers Inc., or Groton, since 1975. During his career, Mr. Drakos has purchased, financed, operated, invested in and sold over 50 vessels, including tankers. In recent years, Groton has been primarily focused on the Aframax tanker sector, although it has also owned and operated other sizes of tankers. Groton has a long history of partnerships with individuals, public companies and investment funds. Mr. Drakos is also a managing director of GP Trading Inc., a position he has held since 2000, and currently a member of the American Bureau of Shipping and of Intertanko North American Panel. Mr. Drakos received a liberal arts degree from Washington and Lee University in 1972.

**Claus Plougmand, Director**

Mr. Plougmand has agreed to serve as a member of the Board upon the completion of the Offering. Mr. Plougmand has been employed in a wide variety of roles within the Maersk Group since 1994. He is currently vice-president/deputy to the chief executive for Maersk Borker Asia, a position he has held since 2009 with overall responsibility for Maersk Broker activities in North East Asia. He is a graduate of Støvring High School, Denmark and has completed studies at INSEAD in France.

**Jens Ismar, Director**

Mr. Ismar has agreed to serve as a member of the Board upon the completion of the Offering. Mr. Ismar has been employed as chief executive officer of Western Bulk AS since 2008. During Mr. Ismar's career, he has held several positions within shipping, including director of chartering and project in Bergesen d.y. ASA from 2001 to

2008 and as managing director of Lorentzen & Stemoco AS from 1997 to 2001. Mr. Ismar holds a bachelor's degree in business administration from Lund University in Sweden.

**11.2        Management**

*11.2.1        Overview*

The Management of Universal currently consists of:

| Name | Employed with Universal since | Current position within Universal |
|------|-------------------------------|-----------------------------------|
| Ronald A. Dal Bello | April 2011 | Chief Executive Officer |
| Richard M. Lemanski | April 2011 | Chief Financial Officer, Treasurer and Secretary |
| Christos G. Papanicolaou | April 2011 | Senior Vice President |

The business address for each executive officer is the address of the Company's principal executive office which is c/o UM (USA) LLC, 545 Madison Avenue, New York, NY 10022.

*11.2.2        Brief biographies of the members of the Management*

Set out below are brief biographies of the Management, including their relevant management expertise and experience, an indication of any significant principal activities performed by them outside the Company.

**Ronald A. Dal Bello – Chief Executive Officer**

Mr. Dal Bello has served as the Company's Chief Executive Officer since April 2011 and has 20 years of experience in international shipping and maritime corporate finance. From 2006 to 2010, Mr. Dal Bello was a member of First Ship Lease Trust's senior management team where he was primarily responsible for the establishment of the company's European offices in Zurich, Switzerland, as well as the development of First Ship Lease's West of Suez strategic platform, the growth of the portfolio and the public listing of the company on the Singapore Stock Exchange. From 2001 to 2006, Mr. Dal Bello, while a director and head of marine financing originations at GE Capital/GE Commercial Finance, led a wide range of financing and investing activities for international shipping entities, including equity, debt and leasing in the U.S., Russia, South America, Europe, Asia and the Middle East. From 1999 to 2001, Mr. Dal Bello was a Vice-President at BancBoston Capital (now Bank of America) where he handled the originating, structuring and negotiating of tax, non-tax enhanced and synthetic lease financing for companies in the maritime industry. From 1997 to 1999, Mr. Dal Bello served as Vice-President at American Marine Advisors, or AMA, where he was responsible for arranging debt, equity and lease transactions as well as providing advisory services for established and emerging maritime companies. From 1990 to 1997, Mr. Dal Bello held various positions at Mitsui & Co, where he managed the operational (new shipbuilding) and financial side of maritime transactions. Mr. Dal Bello holds a Masters of Business Administration degree from New York University and a Bachelor of Arts degree in Economics from Columbia University.

**Richard M. Lemanski – Chief Financial Officer**

Mr. Lemanski has served as the Company's Chief Financial Officer since April 2011 and has over 20 years of experience in international shipping and maritime corporate finance. Mr. Lemanski has worked as a consultant from 2009 to 2011, serving Groton Pacific Carriers Inc., the MTI Network, a leading crisis responder for shipowners in both the maritime and energy industries, and the trustee for the insolvency of Eastwind Maritime Inc., or Eastwind, a diversified owner and operator of over 100 vessels in the tanker, drybulk, container and reefer sectors that filed for Chapter 7 bankruptcy protection on June 24, 2009. From 2007 to 2009, Mr. Lemanski was employed as the Chief Financial Officer of Eastwind, and from 1990 to 2007, he was employed by Stolt-Nielsen Ltd., or Stolt-Nielsen, a publicly-traded holding company operating in 30 countries with international interests in chemical transportation and storage, subsea engineering and construction, aquaculture and e-commerce. Mr. Lemanski held a series of progressive assignments at Stolt-Nielsen with broad exposure to all aspects of finance, accounting, reporting, control, information technology, investor relations and corporate communications. Most recently, he served as Stolt-Nielsen's Senior Vice-President from 2004 to 2007 and Vice-President from 1998 to 2003. Mr. Lemanski holds a Masters of Business Administration degree in Finance and Accounting from the

University of Chicago and a Bachelor of Arts degree in Economics from Northwestern University.

**Christos G. Papanicolaou – Senior Vice-President**

Mr. Papanicolaou has served as the Company's Senior Vice-President since April 2011 and has over twenty years of experience in international shipping. From 1991 to 2011, he was employed by Groton Pacific Carriers Inc and served as its vice president from 2002 to 2011. Mr. Papanicolaou has extensive experience in all aspects of commercial shipping including the purchasing, selling, financing, chartering and operations of vessels with a particular focus on crude tankers and has developed relationships with many major crude oil companies and traders including Royal Dutch Shell plc. Mr. Papanicolaou has purchased, financed, operated, invested in and/or sold over 15 vessels. He is also the founder and a managing director of GP Trading Inc., a ship brokerage firm focused in the lightering business in the Gulf of Mexico which facilitated over 1,000 lighterings in the Gulf of Mexico involving over 500 million barrels of oil. Over the last several years, Mr. Papanicolaou has also worked with leasing companies in developing and procuring assets with long-term leases. He holds a Bachelor of Business Administration from Hofstra University.

**11.3     Directorships and management positions held by the board members and the senior management**

The following table sets forth all companies and partnerships in which the Board Members and senior management have been members of the administrative, management and supervisory bodies in the previous five years (not including directorships and executive management positions in subsidiaries of the Company)

| Name of officer | Position held | Company or partnership | Date of commencement and cessation |
|---|---|---|---|
| M. Bülent Ergin | Board member | Geden Holdings Ltd | 2002 – present |
| | Board member | Turkcell Iletisim A.Ş. | 2005 – present |
| | Board member | Digiturk A.Ş. | 2003 – present |
| | Board member | Genel Denizcilik Nakliyati A.Ş. | 1992 – present |
| | Board member | Çukurova Ithalat A.Ş | 2000 – present |
| | Board member | Çukurova Jenerator A.Ş | 2007 – present |
| | Board member | Show TV | 2003 – present |
| | Board member | Turk Medya | 2003 – present |
| | Board member | Mepaş | 2003 – present |
| | Board member | Zedpaş | 2003 – present |
| | Board member | SkyTurk | 2003 – present |
| | Board member | Maysan Mando | 1999 – present |
| | Board member | Demir Toprak | 1995 – present |
| | Board member | Anadolu Taşımacılık | 1990 – present |
| | Board member | Genel Enerji A.Ş. | 2008 – present |
| | Board member | Digital Platform Teknoloji Hizmetleri | 2002 – present |
| | Board member | İnta Uzay Sistemleri | 2007 – present |
| | Board member | Çukurova Holding A.Ş | 1999 – present |
| | Board member | West of England P&I Club | 2006 – present |
| | Board member | Turkcell Iletisim Hizmetleri A.Ş. | 2005 – present |
| A. Tuğrul Tokgöz | Chief executive officer and board member | Geden Holdings Ltd | 2002 – present |
| | Board member | Çukurova Holding A.Ş. | 2002 – present |
| | Board member | P&I The Swedish Club | 2008 – present |
| | Chief executive officer and board member | Genel Denizcilik Nakliyati A.Ş. | 1997 – present |
| | Board member | Genel Enerji A.Ş. | 2008 – present |

Universal Maritime Inc. – Prospectus

| | | | |
|---|---|---|---|
| | Board member | Çukurova İthalat ve İhracat | 2004 – present |
| | Board member | Çukurova Jeneratör A.Ş. | 2007 – present |
| | Board member | Inta Uzay Sistemleri | 2007 – present |
| | Board member | Mepaş and Zedpaş | 2005 – present |
| | Board member | Intertanko Council | 2008 – present |
| Mehmet Mat | Chief financial officer | Geden Holdings Ltd | 2002 – present |
| | Chief financial officer | Genel Denizcilik Nakliyati A.Ş. | 2000 – present |
| | Board member | Çukurova Jeneratör | 2007 – present |
| | Chief financial officer | Çukurova İthalat ve İhracat | 2004 – present |
| James A. Drakos | Board member and vice chairman | West of England P&I Club | 1999 – present |
| | Board member | GPC Maritime Corp. | 2011 – 2012 |
| | Board member | Alpha Aframax Corp. | 2008 – present |
| | Board member | Glen Carriers Ltd | 2007 – present |
| | Board member | Loch Carriers Ltd | 2007 – present |
| | Board member | Sapphire Transport Ltd | 2006 – present |
| | Board member | Indo Pacific Carriers Ltd | 1975 – present |
| | Board member | Gainey Shipping Ltd | 1998 – present |
| | Board member | Star Transport Ltd | 2003 – present |
| | Board member | Leader Transport Ltd | 2003 – present |
| | Board member | Sea Shipping Ltd | 2003 – present |
| | Board member | Ocean Shipping Ltd | 2003 – present |
| | Board member | SPT Rich Dutchness Inc. | 1997 – present |
| | Board member | Groton Pacific Carriers Inc. | 1975 – present |
| | Managing member | Steamboat Harbor LLC | 1997 – present |
| | Managing member | Greenwich Landing LLC | 2002 – present |
| | Managing member | 70 Seaview Avenue LLC | 1997 – present |
| | Managing member | Southport 19 Investment LLC | 2009 – present |
| Claus Plougmand | Vice president/deputy to the chief executive | Maersk Broker Asia | 2009 – present |
| Jens Ismar | Chief executive officer | Western Bulk AS | 2008 – present |
| | Director of chartering and projecting | Lorentzen & Stemoco AS | 2001 – 2008 |
| | Board member | Exmar N.V. | 2010 – 2012 |
| | Chairman | Oslo Shipowners' Association | 2009 – 2012 |
| | Director | SIGTTO | 2007 – 2008 |
| Ronald A. Dal Bello | Senior vice president | First Ship Lease Trust | 2006 – 2010 |
| Richard M. Lemanski | Chief financial officer | Eastwind Maritime Inc. | 2007 – 2009 |
| | Senior vice president | Stolt-Nielsen Ltd | 2004 - 2007 |
| Christos G. Papanicolaou | Vice president | Groton Pacific Carriers Inc. | 1991 – 2011 |
| | Managing director | GP Trading | 2002 – 2011 |

## 11.4    Remuneration and benefits

### 11.4.1    Remuneration and Benefits for the Board Members

The Company paid no remuneration to the Board Members in 2011.

No Board Member holds any options, warrants, convertible loans or other instruments that would entitle a holder of any such instrument to subscribe for any shares in the Company.

Universal Maritime Inc. – Prospectus

*11.4.2     Remuneration and Benefits for the Management*

The remuneration paid to the Management in 2011 was a total of $ 336,750. No bonus payments were paid in 2011. The table below sets out the remuneration paid to each of the members of the Management in 2011:

| Name | Current position | Remuneration paid in 2011 |
|------|------------------|---------------------------|
| Ronald A. Dal Bello | Chief Executive Officer | $150,000 |
| Richard M. Lemanski | Chief Financial Officer, Treasurer and Secretary | $68,250 |
| Christos G. Papanicolaou | Senior Vice-President | $118,500 |

No member of the Management holds any options, warrants, convertible loans or other instruments that would entitle a holder of any such instrument to subscribe for any shares in the Company.

*11.4.3     Bonus scheme*

As the date of this Prospectus there are no formal bonus schemes for any member of the Management

## 11.5       Benefits upon Termination

There are no agreements between Universal and the Board Members for compensation upon termination of their office.

All three members of the Management have employment contracts granting them severance pay in the event of a termination by UM (USA) LLC other than for cause for the remaining term of the employment contract or for 12 months if the employment contract is terminated during the last year of the contract's term.

In addition, if the employment contract is terminated by UM (USA) LLC other than for cause within two years following a change of control (only related to Geden) in the Company, the employee shall be entitled to a bonus equalling 100 % of the base salary plus a lump sum payment of USD 500,000 (Lemanski), USD 850,000 (Papanicolaou) USD 950,000 (Dal Bello). The lump sum payment is also applicable in the event of a change of control (only related to Geden) in a severance pay period as described in the paragraph above, but in such case, an amount equalling any severance pay received up to the date of the change of control event shall be deducted and the employee shall no longer be entitled to severance pay.

## 11.6       Pensions

There are no defined benefit plans for employees. None of the Board Members are entitled to any defined pension benefits from Universal.

## 11.7       Loans and guarantees

The Company has not granted any loans, guarantees or other commitments to any of the Board Members or to any member of the Management.

## 11.8       Conflicts of interests etc.

During the last five years preceding the date of this Prospectus, no member of the Board or the Management has;

- any convictions in relation to indictable offences or convictions in relation to fraudulent offences;

- received any official public incrimination and/or sanctions by any statutory or regulatory authorities (including designated professional bodies) or ever been disqualified by a court from acting as a member of the administrative, management or supervisory bodies of a company or from acting in the management or conduct of the affairs of any company; or

- been declared bankrupt or been associated with any bankruptcy, receivership or liquidation in his capacity as a founder, director or senior manager of a company except for Richard Lemanski.

12.2.5    *Combined cash flow statements*

The table set out below is derived from the audited Combined Statement of Cash Flows for the Predecessor Companies for the three years ended December 31, 2011, 2010 and 2009 and the unaudited Combined Interim Statement of Cash Flows for the Predecessor Companies for the three month periods ended March 31, 2012 and 2011.

| | Year Ended December 31, | | | Three Month Period Ended March 31, | |
|---|---|---|---|---|---|
| **Combined cash flow statements** | | | | | |
| *(in thousands of $)* | **2011** | **2010** | **2009** | **2012** | **2011** |
| ***Cash flows provided by /(used in) operating activities*** | | | | | |
| Net income /(loss) | (1,203) | 9,388 | (969) | 1,636 | 547 |
| ***Adjustments to reconcile net income /(loss) to cash provided by /(used in) operating activities:*** | | | | | |
| Depreciation of property and Equipment | 21,388 | 11,412 | 1,196 | 6,461 | 4,435 |
| Amortization of deferred revenue | (965) | (795) | -- | (2,532) | (965) |
| Deferred financing charge | 163 | -- | -- | 76 | 17 |
| ***Changes in operating assets and liabilities:*** | | | | | |
| Accounts receivables | 2,459 | (5,920) | -- | (1,347) | (1,152) |
| Inventory | (2,686) | (1,607) | (496) | 805 | (1,072) |
| Other current assets | (53) | (560) | (85) | (823) | (1,690) |
| Other non-current assets | (6,988) | -- | -- | (28) | (89) |
| Other current liabilities | 607 | 606 | 192 | (163) | 1,103 |
| Due to related parties | (644) | 882 | -- | 119 | (882) |
| Accounts payable | 2,523 | 5,081 | 1,394 | 266 | 10,571 |
| Deferred revenue | 2,532 | 965 | 795 | 2,605 | 1,461 |
| **Net cash provided by operating Activities** | **17,133** | **19,452** | **2,027** | **7,075** | **12,290** |
| ***Cash flows from investing activities:*** | | | | | |
| Capital expenditures | (199,275) | (214,834) | (141,029) | -- | (25,401) |
| **Net cash used in investing Activities** | **(199,275)** | **(214,834)** | **(141,029)** | **--** | **(25,401)** |
| ***Cash flows from financing activities:*** | | | | | |
| Proceeds from long-term debt | 138,755 | 193,058 | 61,103 | -- | 8,480 |
| Repayments on debt to banks | (29,351) | (13,814) | (804) | (6,955) | (4,079) |
| Changes in due from related parties | 7,830 | 248 | (14) | -- | 206 |
| Deferred financing charge | (1,730) | -- | -- | -- | (50) |
| Changes in due to related parties | 74,238 | 16,943 | 81,712 | 2,163 | 11,403 |
| **Net cash provided by financing Activities** | **189,742** | **196,435** | **141,997** | **(4,792)** | **15,960** |
| **Net increase in cash and cash Equivalents** | **7,600** | **1,053** | **2,995** | **2,283** | **2,849** |
| Cash and cash equivalents at beginning of the year | 4,051 | 2,998 | 3 | 11,651 | 4,051 |
| **Cash and cash equivalents at end of the year** | **11,651** | **4,051** | **2,998** | **13,934** | **6,900** |
| **Supplemental information** | | | | | |
| Cash paid for interest during the period | 9,769 | 7,767 | 3,273 | 3,368 | 1,513 |
| Capitalized interest cost and financing charges added to capital expenditures as a non-cash item | 37 | 341 | 63 | -- | 5 |
| Additions to capital expenditures incurred with accounts payable | 594 | 469 | 962 | -- | 8,539 |

| 17 | **DESCRIPTION OF THE SHARES AND SHARE CAPITAL** |

*The following is a summary of certain material information relating to the Shares and share capital of the Company and certain other shareholder matters, including summaries of certain provisions of the Articles of Incorporation, Bylaws and applicable Norwegian and Marshall Islands law in effect as of the date of this Prospectus, including the Marshall Islands Business Corporations Act, (the "**BCA**"). The summary does not purport to be complete and is qualified in its entirety by the Articles of Incorporation, Bylaws and applicable law.*

### 17.1 Share capital and share capital history

The issued share capital of the Company as of the date of this Prospectus is $5, divided into 500 ordinary shares, each with a par value of $0.01. All shares in the Company are currently owned by Geden which in turn is 100% indirectly owned by the Karamehmet family in Turkey.

The issued share capital of the Company will, following issuance of the Consideration Shares to Geden, be increased to $106,111.47 divided into 10,611,147 Shares, each with a par value of $0.01.

The issued share capital of the Company will be further increased through completion of the Offering, see Section 6, "The Offering" for further details on the Offering.

The Company does not hold any treasury shares.

The table below shows the development in the Company's authorized share capital development for the period from incorporation to the date hereof:

| Date | Type of change | Capital increase | New share capital | No. of Shares | Par value per Share |
|------|----------------|------------------|-------------------|---------------|---------------------|
| March 3, 2011 | Incorporation | - | $0 | 0 | - |
| March 3, 2011 | Capital increase | $500 | $5 | 500 | $0.01 |

### 17.2 VPS registration of the Shares

The Company has appointed VPS as the Company's register of shareholders so that, upon Listing, title to the Shares may be evidenced and transferred without a written instrument by VPS. The Shares (and not only the beneficial interests in the Shares) are expected to be registered in the VPS with effect from the Listing (see also Section 18.4 "Securities Trading in Norway—VPS and transfer of shares").

### 17.3 Shareholders

As of the date of this Prospectus, the Company has one shareholder, Geden, which owns 100% of the Shares. The Shares held by the majority shareholder do not and will not carry any different voting rights than the Offer Shares to be issued in connection with the Offering, nor any of the existing issued Shares. Thus, all the Shares carry the right to vote as described in Section 17.7.3 "—The Articles of Incorporation, the Bylaws and Marshall Islands law—Common shares".

As further described in Section 5.2 "The acquisition of the Initial Fleet—The Acquisition Agreement", Geden will receive 10,610,647 Shares in the Company as compensation for the sale of Initial Fleet. Furthermore, Geden will subscribe for up to 2 million Offer Shares in the Offering. Assuming that Geden is allocated 2 million Offer Shares in the Offering, Geden will have an ownership interest in the Company following completion of the Offering of at least 37.68% if the Company raises $200 million in the Offering and 41.98% if the Company raises $170 million in the Offering assuming final Offer Price is set in the mid-point of the Indicative Price Range set out on the front page of the Prospectus. Geden's ownership interest will be reduced to 35.27% and 39.43% respectively if the Over-Allotment Option is exercised in full.

As a result of Geden's substantial ownership interest in the Company, Geden has the ability to exert significant influence over certain actions requiring shareholder approval. The influence must be exercised in accordance with the Bylaws. Apart from aforesaid, there are no specific measures in place regulating the exercise of influence which a follows from holding a significant share or majority of the Shares. Geden will however not control the Company following the Offering as they will not own the majority of the Shares.

## 21      DEFINITIONS AND GLOSSARY

In the Prospectus, the following defined terms have the following meanings:

| | |
|---|---|
| Acquisition Agreement...................... | The acquisition agreement entered into between the Company and Geden on May 28, 2012 regarding the purchase of all outstanding shares in the Predecessor Companies. |
| Additional Shares ............................. | The additional Offer Shares issued pursuant to the over-allotment by the Stabilization Manager (with the consent of the Board) up to 10% of the number of Offer Shares issued in the Offering. |
| Agreement on Right of First Refusal............................................. | The agreement entered into between the Company and Geden  which grants the Company rights of first refusal to any and all long term business opportunities developed by Geden in the crude oil, blue water, transportation segment for as long as Geden remains a major shareholder of the Company. |
| Anti-Money Laundering Legislation... | Norwegian Money Laundering Act of March 6, 2009 No. 11 and the Norwegian Money Laundering Regulations of March 13, 2009 No. 302, collectively. |
| Application Period ............................ | The application period for the Retail Offering which is expected to take place from 09:00 hours (CET) on June 20, 2012 to 12:00 hours (CET) on June 29, 2012, unless shortened or extended. |
| Articles of Incorporation................... | The Company's amended and restated articles of incorporation attached as Appendix A to this Prospectus. |
| Audit Committee............................... | The Company's audit committee. |
| Baltic Exchange................................ | Baltic Exchange Limited |
| BCA ................................................. | Marshall Islands Business Corporations Act |
| BITR................................................. | Baltic International Tanker Routes. |
| Blue................................................. | Blue Shipping Ltd. |
| Board .............................................. | The board of directors of the Company. |
| Board Members................................ | The members of the Board |
| Bookbuilding Period ......................... | The bookbuilding period for the Institutional Offering which is expected to take place from 09:00 hours (CET) on June 20, 2012 to 17:30 hours (CET) on June 29, 2012, unless shortened or extended. |
| Borrowed Shares.............................. | Shares made available to the Managers by Geden pursuant to a share lending agreement to facilitate delivery-versus-payment in the Offering. |
| Business Day ................................... | Any day the banks are open in Norway |
| BP.................................................... | British Petroleum Plc. |
| BP Oil............................................... | BP Oil International. |
| Bylaws............................................. | The Company's amended and restated bylaws attached as Appendix A to this Prospectus. |
| CET.................................................. | Central European Time. |
| Chairman ......................................... | The chairman of the Board. |
| Clarkson........................................... | Clarkson Valuations Limited. |
| Closing Date..................................... | The date the shares in the 10 SPVs will be transferred to the Company, assumed to be on or about July 9, 2012. |
| Company........................................... | Universal Maritime Inc. |
| Combined Financial Information ....... | The Combined Financial Statements and the Combined Interim Financial Statements. |
| Combined Financial Statements....... | The combined financial statements of Predecessor Companies as of and for the years ended December 31, 2011, 2010 and 2009. |
| Combined Interim Financial Statements ........................................ | The unaudited combined interim financial statements of Predecessor Companies for the three months ended March 31, 2012 and 2011. |
| Consideration Shares....................... | 10,610,647 Shares to be issued to Geden at a subscription price of $10 as compensation for the Initial Purchase Price. |

Universal Maritime Inc. – Prospectus

| | |
|---|---|
| Consolidated Financial Information... | The Consolidated Financial Statements and the Consolidated Interim Financial Statements. |
| Consolidated Financial Statements .. | Universal's audited consolidated financial statements for the period from its inception to December 31, 2011. |
| Consolidated Interim Financial Statements ........................................ | Universal's unaudited interim consolidated financial statements as of and for the three months ended March 31, 2012 and from March 3, 2011 (the date of inception) to March 31, 2011. |
| Corporate Governance Code............ | The Norwegian Code of Practice for Corporate Governance, recommended by Norsk Utvalg for Eierstyring og Selskapsledelse (NUES) of October 21, 2010, as updated October 20, 2011. |
| Current Debt Facilities ..................... | The current credit facilities held by the Predecessor Companies and which will be settled upon closing of the Offering. |
| DNB Markets.................................... | DNB Markets, a part of DNB Bank ASA. |
| Drewry............................................. | Drewry Shipping Consultants Limited. |
| DVB Capital Markets ........................ | DVB Capital Markets LLC. |
| EEA.................................................. | The European Economic Area. |
| EUR ................................................. | The lawful currency of the participating member states in the European Union. |
| Existing Debt ................................... | The loans owed by the ten Predecessor Companies to their financial lenders on the closing date of the Transaction and costs incurred as a consequence of the prepayment of the loans. |
| Fearnley Fonds ............................... | Fearnley Fonds ASA. |
| FSMA ............................................... | The Financial Services and Markets Act 2000. |
| Geden .............................................. | Geden Holding Ltd. |
| IEA ................................................... | International Energy Agency. |
| IMF................................................... | International Monetary Fund. |
| Indicative Price Range..................... | The indicative price range in the Offering of NOK 45 to NOK 60 ($~7.5 to $~10) per Offer Share. |
| Initial Fleet...................................... | The ten vessels, five Aframax and five Suezmax tankers, owned by the Predecessor Companies. |
| Initial Purchase Price....................... | $106,106,470. |
| Institutional Offering ........................ | An institutional offering which comprises of (a) institutional and professional investors in the EEA pursuant to the provisions of Article 3(2) of the EU Prospectus Directive 2003/71/EC, (b) in the United States, to QIBs as defined in, and in reliance on, Rule 144A under the U.S. Securities Act, and (c) to institutional investors outside the EEA and the United States pursuant to applicable exceptions from local prospectus requirements; subject to a lower limit per application of an amount of NOK 1,000,000. |
| Joint Bookrunners ............................ | DNB Markets, Fearnley Fonds and RS Platou Markets. |
| Joint Lead Managers ........................ | DNB Markets, Fearnley Fonds and RS Platou Markets. |
| KPMG Turkey.................................... | KPMG Akis Bagimsiz Denetim ve SMMM A.Ş. |
| Listing.............................................. | The listing of the Shares on the Oslo Stock Exchange or, alternatively, Oslo Axess. |
| Management ..................................... | The senior management group of Universal Maritime Inc. |
| Managers ......................................... | DNB Markets, DVB Capital Markets, Fearnley Fonds and RS Platou Markets as Joint Lead Managers. |
| Managers' Representatives .............. | The Managers' affiliates, representatives, officers, employees or advisors. |
| Master Umbrella Agreement............. | An agreement between the Company and Shell relating to, among other things, the charter agreements currently in place between Shell and eight of the SPV's to be acquired by the Company pursuant to the Acquisition Agreement upon completion of the Offering. |
| Member States................................. | The participating member states of the European Union. |
| Mitigation Rate ................................ | $29,000 per day. |
| New Debt Facility ............................ | The senior credit facility agreement between the Predecessor Companies as borrowers, the Company as guarantor and a syndicate of banks in the amount of $275.000.000. |
| NOK................................................. | Norwegian Kroner, the lawful currency of Norway. |

Universal Maritime Inc. – Prospectus

| | |
|---|---|
| NOKUS ............................................ | Controlled foreign corporation taxation |
| Norwegian Corporate Shareholder ... | Norwegian shareholders who are limited liability companies, equities funds, savings banks. mutual insurance companies or similar entities tax-resident in Norway. |
| Norwegian FSA ................................ | The Financial Supervisory Authority of Norway (*Nw.: Finanstilsynet*). |
| Norwegian Personal Shareholder ..... | Norwegian shareholders who are individuals. |
| Norwegian Securities Trading Act..... | The Norwegian Securities Trading Act of June 28, 2007, no. 75 *(Nw.: verdipapirhandelloven)*. |
| Offering ........................................... | The global offering including the Institutional Offering and the Retail Offering taken together. The Offering is expected to be in the region of $170 million and $200 million (equivalent to minimum NOK 1,020 million and maximum NOK 1,200 million using exchange rate of 6.0 Norwegian kroner to U.S. Dollars) prior to exercise of the Over-Allotment Option. |
| Offer Price....................................... | The final offer price for the Offer Shares in the Offering. The Offer Price may be set above or below the Indicative Price Range. |
| Offer Shares.................................... | The Shares issued in and pursuant to the Offering. |
| Option Agreement ............................ | The agreement between the Company and Geden, pursuant to which the Company has an option to purchase up to two crude oil tankers from Geden. |
| Option Period .................................. | 12 months from the first date of listing of the Shares. |
| Order................................................ | The Financial Services and Markets Act 2000 (Financial Promotion) Order 2005, as amended. |
| Original Charter Rate....................... | $37,300 per day. |
| Oslo Axess ...................................... | A Norwegian regulated market place, operated by Oslo Børs ASA. |
| Oslo Stock Exchange ...................... | Oslo Børs ASA, or, as the context may require, Oslo Børs, a Norwegian regulated stock exchange operated by Oslo Børs ASA. |
| Over-Allotment Option ..................... | Option granted to DNB Markets to buy the Additional Shares initially allocated in the Offering to cover over-allotments in connection with the Offering hand short positions, if any, exercisable within a 30-day period commencing at the time trading in the Shares on the Oslo Stock Exchange (alternatively Oslo Axess). |
| Payment Date .................................. | The payment date for the Offer Shares, expected to be July 4, 2012 in the Retail Offering and July 5, 2012 in the Institutional Offering 2012. |
| Pink Charter .................................... | The charter party regarding the vessel M/T Pink. |
| Predecessor Companies ................. | The ten special purpose companies owning the Initial Fleet that will be acquired by the Company from Geden pursuant to the Acquisition Agreement. |
| Prospectus ...................................... | This Prospectus dated June 19, 2012. |
| Prospectus Directive........................ | Directive 2003/71/EC of the European Parliament and of the Council of November 4, 2003. |
| QIBs................................................. | Qualified institutional buyers as defined in Rule 144A. |
| Reimbursed Parties......................... | Groton Pacific Carriers Inc, GPC Maritime Corp, Universal Maritime (USA) LLC, James Drakos, Christos G Papanicolaou and Richard Lemanski. |
| Regulation S.................................... | Regulation S under the U.S. Securities Act. |
| Relevant Persons ............................ | Persons in the UK that are (i) investment professionals falling within Article 19(5) of the Order or (ii) high net worth entities, and other persons to whom the Prospectus may lawfully be communicated, falling within Article 49(2)(a) to (d) of the Order. |
| Retail Application Form ................... | Application form to be used to apply for Offer Shares in the Retail Offering, attached to this Prospectus as Appendix G. |
| Retail Offering ................................. | An offering to the public in Norway subject to a lower limit per application of an amount of NOK 10,500 and an upper limit per application of an amount of NOK 999,999 for each investor. |
| Relevant Member State.................... | Each Member State of the European Economic Area which has implemented the Prospectus Directive. |
| RSA ................................................. | The New Hampshire revised statutes. |
| RS Platou Markets ........................... | RS Platou Markets AS. |

Universal Maritime Inc. – Prospectus

| | |
|---|---|
| Rule 144A ........................................ | Rule 144A under the U.S. Securities Act. |
| SEC ................................................. | U.S. Securities and Exchange Commission. |
| Share(s) .......................................... | Means common shares in the capital of the Company, each with a par value of $0.01, or any one of them, including the Offer Shares. |
| Shareholder Loans ........................... | The current shareholder loans from Geden to the Predecessor Companies. |
| Shell ................................................ | Shell Western Supply and Trading Limited, a wholly-owned subsidiary of Royal Dutch Shell plc. |
| Sponsor Agreement ......................... | The sponsor loan and guarantee agreement dated April 27, 2012 between Geden and the Company, pursuant to which Geden has provided to the Company a financial facility in the amount of $5.0 million in connection with the establishment of Universal and the Offering. |
| SPVs ............................................... | The ten special purpose companies owning the Initial Fleet that will be acquired by the Company from Geden pursuant to the Acquisition Agreement. |
| Stabilization Manager ...................... | DNB Markets. |
| ST Shipping ...................................... | S.T. Shipping & Transport PTE |
| Target .............................................. | Target Shipping Ltd. |
| Transaction ...................................... | The Company's purchase of all outstanding shares in the Predecessor Companies. |
| UK ................................................... | United Kingdom. |
| Universal ......................................... | Universal Maritime Inc. and its subsidiaries |
| U.S. or United States ....................... | The United States of America. |
| U.S. Exchange Act ........................... | U.S. Securities Exchange Act of 1934, as amended. |
| USGAAP ......................................... | Generally accepted accounting principles in the United States |
| U.S. Holder ...................................... | A beneficial owner of Shares. |
| U.S. Investor .................................... | Prospective investors that are U.S. persons or have a registered U.S. address. |
| U.S. Securities Act .......................... | The United States Securities Act of 1933, as amended. |
| $ or U.S. Dollar ............................... | United States Dollars, the lawful currency of the United States. |
| Valuation ......................................... | A valuation of the Initial Fleet on a charter free basis as of May 21, 2012 provided by Clarkson. |
| Vessels ........................................... | The vessels the Company may acquire from Geden pursuant to the Option Agreement. |
| VLCC .............................................. | Very Large Crude Carrier. |
| VPS ................................................. | The Norwegian Central Securities Depository (*Nw.: Verdipapirsentralen*). |
| VPS Account .................................... | An account with VPS for the registration of holdings of securities. |
| Wiersholm ....................................... | Advokatfirmaet Wiersholm AS |

EXHIBIT 7

SCHEDULE 11 – Organisational Chart



**Mr. Ali Tugrul Tokgoz**

**Mrs. Gulsun Nazli Karamehmet Williams**

15 % owned

85 % owned

**Forward Holdings LLC**
*Managed by Board of Directors*

100 % owned

**Advantage Holdings LLC**
*Member-managed*

100 % owned

**Advantage Tankers LLC**
*Managed by Board of Directors*

All 100% owned

Advantage Sun Shipping LLC

Advantage Start Shipping LLC

Advantage Sky Shipping LLC

Advantage Solar Shipping LLC

Advantage Award Shipping LLC

Advantage Azure Shipping LLC

Advantage Anthem Shipping LLC

Advantage Avenue Shipping LLC

Advantage Arrow Shipping LLC

*All Nine Advantage Shipping Entities are Member-managed*
149

1.14-6180.00 21327758 v4

# EXHIBIT 8

**"Commercial Manager"** means Genel Denizcilik Nakliyati A.S., a company incorporated under the laws of Turkey with its registered office at Büyükdere Cad., Yapi Kredi Plaza A Blok Kat 12, 34330 Levent / Istanbul, Turkey.

**"Commitment"** means:

(a)     in relation to an Original Lender, the amount set opposite its name under the heading "Commitment" in Schedule 1 (*The Original Lenders*) and the amount of any other Commitment transferred to it under this Agreement; and

(b)     in relation to any other Lender, the amount of any Commitment transferred to it under this Agreement,

to the extent not cancelled, reduced or transferred by it under this Agreement.

**"Commitment Fee"** means the commitment fee to be paid by the Borrowers to the Agent under Clause 11.1 (*Commitment Fee*).

**"Compliance Certificate"** means a certificate substantially in the form set out in Schedule 6 (*Form of Compliance Certificate*).

**"Confidential Information"** means all information relating to any Security Party, the Finance Documents or the Loan of which a Finance Party becomes aware in its capacity as, or for the purpose of becoming, a Finance Party which is received by a Finance Party in relation to, or for the purpose of becoming a Finance Party under, the Finance Documents or the Loan from either:

(c)     any Security Party or any of its advisers; or

(d)     another Finance Party, if the information was obtained by that Finance Party directly or indirectly from any Security Party or any of its advisers,

in whatever form, and includes information given orally and any document, electronic file or any other way of representing or recording information which contains or is derived or copied from such information but excludes information that:

(i)     is or becomes public information other than as a direct or indirect result of any breach by that Finance Party of Clause 35 (*Confidentiality*); or

(ii)    is identified in writing at the time of delivery as non-confidential by any Security Party or any of its advisers; or

(iii)   is known by that Finance Party before the date the information is disclosed to it in accordance with (a) or (b) or is lawfully obtained by that Finance Party after that date, from a source which is, as far as that Finance Party is aware, unconnected with any Security Party and which, in either case, as far as that Finance Party is aware, has not been obtained in breach of, and is not otherwise subject to, any obligation of confidentiality.

**"Confidentiality Undertaking"** means a confidentiality undertaking substantially in a recommended form of the Loan Market Association at the relevant time.

**"Guarantor"** means Advantage Tankers LLC, a limited liability company formed under the laws of the Marshall Islands with its registered office at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands MH96960 and company number 961398 and/or (where the context permits) any other person who shall at any time during the Facility Period give to the Lenders or to the Security Agent on their behalf a guarantee and/or indemnity for the payment of all or part of the Indebtedness.

**"Holding Company"** means, in relation to a person, any other person in respect of which it is a Subsidiary.

**"IAPPC"** means a valid international air pollution prevention certificate for a Vessel issued under Annex VI.

**"IFRS"** means international accounting standards within the meaning of the IAS Regulation 1606/2002 to the extent applicable to the relevant financial statements.

**"Impaired Agent"** means the Agent at any time when:

(a)    it has failed to make (or has notified a Party that it will not make) a payment required to be made by it under the Finance Documents by the due date for payment;

(b)    the Agent otherwise rescinds or repudiates a Finance Document;

(c)    (if the Agent is also a Lender) it is a Defaulting Lender under (a) or (b) of the definition of "Defaulting Lender"; or

(d)    an Insolvency Event has occurred and is continuing with respect to the Agent;

unless, in the case of (a):

(i)    its failure to pay is caused by:

  (A)    administrative or technical error; or

  (B)    a Disruption Event; and

  payment is made within three Business Days of its due date; or

(ii)    the Agent is disputing in good faith whether it is contractually obliged to make the payment in question.

**"Indebtedness"** means the aggregate from time to time of: the amount of the Loan outstanding; all accrued and unpaid interest on the Loan; and all other sums of any nature (together with all accrued and unpaid interest on any of those sums) payable to any of the Finance Parties under all or any of the Finance Documents.

**"Insolvency Event"** in relation to an entity means that the entity:

(a)    is dissolved (other than pursuant to a consolidation, amalgamation or merger);

**"VAT"** means:

(a)     any tax imposed in compliance with the Council Directive of 28 November 2006 on the common system of value added tax (EC Directive 2006/112); and

(b)     any other tax of a similar nature, whether imposed in a member state of the European Union in substitution for, or levied in addition to, such tax referred to in (a), or imposed elsewhere.

**"Vessels"** means the following vessels, and everything now or in the future belonging to them on board and ashore, currently registered under the respective flags set out below in the ownership of the respective Borrowers and **"Vessel"** means any one of them:

| Name of Vessel | IMO no | Flag | Borrower | Seller |
|---|---|---|---|---|
| "ADVANTAGE ATOM" (ex "BRAVO") ("**Vessel A**") | 9472622 | Marshall Islands | Advantage Atom Shipping LLC | Bravo   Shipping Ltd. |
| "ADVANTAGE ANTHEM" (ex "POWER") ("**Vessel B**") | 9472634 | Marshall Islands | Advantage Anthem Shipping LLC | Barbaros Maritime Ltd. |
| "ADVANTAGE AWARD" (ex "VALUE") ("**Vessel C**") | 9470131 | Marshall Islands | Advantage Award Shipping LLC | Value   Shipping Ltd. |

**"VTL Coverage"** has the meaning ascribed to that term in Clause 17.19 (*Additional security*).

**"Working Capital"** means, on a consolidated basis, in respect of the Guarantor, its Current Assets less its Current Liabilities.

1.2     **Construction**     Unless a contrary indication appears, any reference in this Agreement to:

1.2.1     any **"Lender"**, any **"Borrower"**, the **"Agent"**, the **"Swap Provider"**, any **"Secured Party"**, the **"Security Agent"**, any **"Finance Party"** or any **"Party"** shall be construed so as to include its successors in title, permitted assignees and permitted transferees;

1.2.2     a document in **"agreed form"** is a document which is previously agreed in writing by or on behalf of the Borrowers and the Agent or, if not so agreed, is in the form specified by the Agent;

# EXHIBIT 9

than the Threshold Amount (except for repairs the cost of which is recoverable under the Insurances and in respect of which the insurers have agreed to make payment in accordance with any applicable loss payable clause) unless that person shall have given an undertaking to the Mortgagee in such terms as the Mortgagee shall require not to exercise a lien on the Vessel for the cost of the work; and

6.25    to keep proper books of account in respect of the Vessel and the Earnings and as and when required by the Mortgagee to make such books available for inspection on behalf of the Mortgagee; and

6.26    to place and retain a certified copy of this Mortgage on board the Vessel and cause such certified copy of this Mortgage to be exhibited by the Master to any representative of the Mortgagee and to any person having business which may give rise to a maritime lien or to the sale, conveyance or mortgage of the Vessel, and to place and keep displayed on the Vessel a framed printed notice in plain type reading as follows:

**"Notice of Mortgage**

This Vessel is covered by a first preferred Mortgage given by Advantage Anthem Shipping LLC as Owner to UniCredit Bank AG as Mortgagee under authority of Chapter 3 of Title 47 of the Marshall Islands Revised Code (as amended).  Under the terms of the said Mortgage neither the Owner nor any Charterer nor the Master of this Vessel nor any other person has any right, power or authority to create, incur or permit to be imposed upon this Vessel any lien whatsoever other than for crew's wages and salvage"; and

6.27    not without the prior written consent of the Mortgagee to appoint anyone other than Genel Denizcilik Nakliyati A.S as commercial or technical managers of the Vessel, nor to terminate nor materially vary the arrangements for the commercial or technical management of the Vessel, nor to permit the commercial or technical management of the Vessel to be sub-contracted or delegated to any third party; and

6.28    to take all reasonable precautions to prevent any infringements of any anti-drug legislation in any jurisdiction in which the Vessel shall trade and in particular (if the Vessel is to trade in the United States of America) to take all reasonable precautions to prevent any infringements of the Anti-Drug Abuse Act of 1986 of the United States of America; and

6.29    to comply, or procure that the operator of the Vessel will comply, with the International Management Code for the Safe Operation of Ships and for Pollution Prevention adopted by the International Maritime Organisation (as the same may be amended from time to time) (the **"ISM Code"**) or any replacement of the ISM Code and in particular, without limitation, to:

6.29.1    procure that the Vessel remains for the duration of the Facility Period subject to a safety management system developed and implemented in accordance with the ISM Code; and

6.29.2    maintain for the Vessel throughout the Facility Period a valid and current safety management certificate issued under paragraph 13.7 of the ISM Code (**"SMC"**) and provide a copy to the Mortgagee; and

# EXHIBIT 10

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| PSARA ENERGY, LTD., | § | |
| Plaintiff, | § | |
| | § | Civil Action No. 2:16-CV-_____ |
| v. | § | |
| | § | JUDGE_____ |
| SPACE SHIPPPING, LTD; ADVANTAGE | § | |
| ANTHEM SHIPPING, LLC; GENEL | § | MAG. JUDGE_____ |
| DENIZCILIK NAKLIYATI A.S. A/K/A GEDEN | § | |
| LINES; GEDEN HOLDINGS, LTD; | § | ADMIRALTY |
| ADVANTAGE TANKERS, LLC; | § | |
| ADVANTAGE HOLDINGS, LLC; FORWARD | § | |
| HOLDINGS, LLC; MEHMET EMIN | § | |
| KARAMEHMET; and GULSUN NAZLI | § | |
| KARAMEHMET -WILLIAMS | § | |
| | § | |
| | § | |
| Defendants. | § | |

## ATTORNEY DECLARATION

Pursuant to 28 U.S.C. § 1746, this declaration is executed by George A. Gaitas, counsel for Plaintiff, PSARA ENERGY, LTD., in order to secure the issuance of a Summons and Process of Maritime Attachment and Garnishment in the above-captioned Admiralty Cause.  I, George A. Gaitas, declare under the penalty of perjury:

I am a Member of the firm of CHALOS & CO, P.C., attorneys for Plaintiff in the above referenced matter.

I am familiar with the circumstances of the Original Verified Complaint, and I submit this declaration in support of Plaintiff's request for the issuance of Process of Maritime Attachment and Garnishment of the property of the Defendants, SPACE SHIPPING LTD. (hereinafter "SPACE SHIPPING"); ADVANTAGE ANTHEM SHIPPING, LLC (hereinafter "ANTHEM SHIPPING"); GENEL DENIZCILIK NAKLIYATI A.S. A/K/A GEDEN LINES (hereinafter

1

"GEDEN"); ADVANTAGE TANKERS, LLC (hereinafter "ADVANTAGE TANKERS");

ADVANTAGE HOLDINGS, LLC (hereinafter "ADVANTAGE HOLDINGS"); FORWARD

HOLDINGS, LLC (hereinafter "FORWARD HOLDINGS"); MEHMET EMIN KARAMEHMET

(hereinafter "KARAMEHMET"); and GULSUN NAZLI KARAMEHMET-WILLIAMS

(hereinafter "KARAMEHMET-WILLIAMS"), pursuant to Rule B of the Supplemental Rules for

Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

I have personally inquired or have directed inquiries into the presence of the Defendants in

this District.

I have directed attorneys in my firm to check with the office of the Louisiana Secretary of

State, using the Secretary of State's database, to determine whether the Defendants can be located

within this District. SPACE SHIPPING, ANTHEM SHIPPING, GEDEN, ADVANTAGE

TANKERS, ADVANTAGE HOLDINGS, FORWARD HOLDINGS, MEHMET EMIN

KARAMEHMET and GULSUN NAZLI KARAMEHMET-WILLIAMS are not registered with

the Louisiana Secretary of State.  Accordingly, I have determined that, as of February 16, 2016

none of these Defendants are incorporated or registered as foreign corporations pursuant to the

laws of Louisiana, and have neither nominated nor appointed any agent for the service of process

within this District.

I have directed attorneys in my firm to engage a search of the Superpages telephone

directory on the internet, and determined that there are no telephone listings or addresses for the

Defendants within this District.

I have directed attorneys in my firm to engage in a Google search as to whether the

Defendants can be located within this District.  The Google search results did not provide a listing

for any of the named Defendants.

2

I am unaware of any general or managing agent(s) of the named Defendants within this District.

In that I have been able to determine that the Defendants have not appointed an agent for service of process within the Eastern District of Louisiana and that I have found no indication that the Defendants can be found within this District for the purposes of Rule B, I have formed a good faith belief based on the investigation of the attorneys under my direction that the Defendants do not have sufficient contacts or business activities within this District and do not have any offices or agents within this District to defeat maritime attachment under Rule B of the Supplemental Rules for Admiralty and Maritime Claims as set forth in the Federal Rules of Civil Procedure.

It is my belief, based upon an investigation performed by attorneys in my firm under my direction that the Defendants cannot be found within this District for the purposes of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

Respectfully submitted,

Date:   February 16, 2016          CHALOS & CO, P.C.
Houston, TX

By:     /s/ George A. Gaitas_____
        George A. Gaitas
        State Bar No. 05879
        Federal Bar No. 705176
        7210 Tickner Street
        Houston, Texas 77055
        Telephone: 713-936-2427
        Fax: 866-702-4577
        E-mail:gaitas@chaloslaw.com

        *Attorneys for Plaintiff*
        PSARA ENERGY, LTD.

3